By the Court,

Cowen, J.
The specific objections to the certificate of proof endorsed on the deed, are now heard for the first time. They lie, first, in the commissioner’s omission to state the place of residence of the *83 identifying witness, and secondly, that it appears that the subscribing witness, after being identified, instead of swearing to the execution of the léase, simply stated that the parties acknowledged its execution. The objection at the circuit was too general. The first specification under it [143] is, however, answered by the case of Dibble v. Rogers (13 Wendell, 536). The second would perhaps have been valid when made, if it had then been sufficiently specific. ' This summary mode of proof by a subscribing witness should be by one who saw the execution of the deed; non constat but that Jenkins merely heard a casual admission, by the parties, that they executed, and then placed his name as a subscribing witness. But the generality of the objection is fatal. The attention of the judge and of the plaintiff should have been drawn to the specific defect. It is true that no exception was taken on this point, but these objections, in order to the moving for a new tiial on a case, should, in general, be equally specific as if intended for a bill of exceptions. The reason in both cases is the same; to appraise the opposite party, so that he may supply the defect, and the court, in order that the question of law may be seen. Neither is possible where the objection is, as here, addressed to the whole instrument in evidence. It may as well lie to the whole case as proved, or to an instrument of any length and complication. Accordingly, a general objection to the allowance of interest on a whole account, some items of which carried interest though others did not, was hólden to be too indefinite to reach those not carrying interest (Reab v. McAllister, 13 Wendell, 109). And, what is still nearer in point an objection to the reading of certain depositions, on the ground that they were not legally taken, was held to be an exception so general as not to reach the want of a proper seal by the officer before whom they were taken. It was held that the party should have mentioned the absence of the seal (Ohio Ins. Co. v. Edmondson, 5 Mill. Lou. R. 295, 300, 301). So an objection to the admission of a deposition in evidence, without saying for what, was followed .on error with alleging a want of due notice of the time of taking it. The court said they would not regard the objection as going to the manner of taking it. The great danger of allowing such general objections was strikingly illustrated in the last case; for, on the objection being stated upon error, a ■ certiorari was sent to bring up the proceedings, when it appeared that full notice had been [144] given. The fact had not been put into the bill, merely because no notice was taken of it by objection; and had the judge made the bill so spe. cifie as to reach the fact, it would have been false. The counsel who made the objection on error, was very properly reprimanded by Judge Tucker (Mandeville v. Perry, 6 Call, 78, 82). These cases are point blanc to the one at bar, on the generality of the objection. It was merely that the certificate was insufficient, without showing either the want of fixing the residence of the identifying witness, or the more lurking distinction upon the precise words which speak of the acknowledgment. Another conclusive answer is that the execution of the lease was fully proved by Ovid P. Wells, a witness called by the defendant to establish another lease to Delacroix. He was a subscribing witness to the lease declared upon, and in answer to the defendant’s own inquiry, swore to that fact, and that he saw both leases executed at the same time.
The judge was clearly right in deciding that, under the pleadings, all the material allegations of the plaintiff, except as to the execution of the lease, were admitted (Cooper v. Watson, 10 Wendell, 202). Even a notice of special matter (Kane v. Sanger, 14 Johns. R. 89), or a stipulation to allow such matter in evidence (Dale v. Rosevelt, 9 Cowen, 307), will not enlarge the operation of the plea. This does not preclude the defendant, under a proper notice, from taking the onus on himself of negating by evidence, what would *84 otherwise stand technically and conclusively admitted; nor was he here denied that right.
No authority was cited on the argument for the right to prove a breach of the cross-covenant and clause of re-entry. The ground taken is that the lease became void by the breach alone. There is no express provision that it should be void for that cause; but only that.the defendant might re-enter, and that he should then be in as of his former estate. He had not re-entered. We think his only course to avoid the deed, was to do so either by [145] his own act or by an ejectment, until which the lease was voidable merely, and not void, it is not necessary to say what would have been the effect of a direct nullifying clause.
Nor can this court notice the mere equitable right of the Paddocks to a ease; and consider as already done, what a court of equity might decree upon the doctrine of that court under the statute of frauds. No such rule prevails at law; nor can it be noticed in a court of law for the purpose of saying that an oral contract to give an indenture of lease for ten years, though followed by immediate possession in the lessees, shall be deemed a lease for that time in prcesenti; nor can we give relation to the subsequent lease back to the time of the contract. This would be a very doubtful defence, we should think, in a court of law, even had the original contract been in writing. The rights of the parties in a coprt of chancery are entirely foreign to the case. It never has been held that a court of law can in any way enforce these oral contracts declared utterly void by the statute of frauds, although there may be a part execution.
Laying that contract out of view, the question arises whether that lease and what followed were a breach of the covenant. And we think they were so. The erection of the rival mill might have been easily prevented by proper covenants and clauses of forfeiture in the lease to the Paddocks, which the defendant failed to introduce; but he gives a lease and receives rent for general unrestricted purposes. This was a breach by the defendant himself from the time when Paddocks’ mill went into operation. The case of Rex v. Pedley (1 Adolph. & Ellis, 822), will be found to contain principles entirely sustaining this view of the case, if any authority be necessary for saying that the erection of a rival mill, resulting at least from the defendant’s gross negligence, and of which he is annually receiving the avails by way of rent, shall not be deemed his own act.
The only remaining questions are, whether the covenant sued upon runs with the land; at what time it was broken; and was it proper to receive the opinions of witnesses as to the amount of the plaintiff’s damage. [146] 1. Does this covenant run with the land ? We think there is no very great difficulty in saying with the learned judge at the circuit, that the breach did not arise till the rival mill of the Paddocks was in operation. That was posterior to the assignment from Delacroix to the plaintiff; which disposes of the objection "that the covenant, by being broken at the time, had already taken the character of a chose in action. The reasons Why tlie execution of the lease was not, per se, a breach, can better be considered after looking into the nature and quality of the covenant for assignability. Did it pass by assignment and vest the legal right to sue in the plaintiff as assignee, or must he come here in the name of Delacroix?
The questions on the nature of the covenant could, as suggested by the circuit judge, properly be heard only on motion in arrest. The parties, .however, had a right to waive that form as they have done, and argue the question in connection with the case. I shall, therefore, proceed to consider it.
The covenant enjoys, as we shall see, a position most favorable for an assignable character. It is between lessor and lessee, and so the requisite *85 privity arises, if it be susceptible of privity. It has express words, for it is to the lessee and his assigns. It is within the words of a statute (1 R. S. 739, § 23, 4, 2d ed.), enacting that it may be so assigned as to carry the lessee’s remedies over to his assignee. We therefore have only to inquire whether it be within the intent of the statute, so inherent in the estate demised or connected with it, as not to come within the objection of being collateral or personal, which, I take it, means such a covenant in the lease as appears to be foreign from the demise, not touching the land or its value, or the value of the reversion or of the term, or going to fix the amount of the rent; in short, a distinct matter which the parties have put in by the by, as they might do in respect to a horse or a cow, or a distinct farm, or some other matter which at least does not appear necessarily' to influence the demise. The immediate point before us is new to this country; nor has it been directly adjudicated in England, the country of lessors and lessees, and [147] the country of our law'. We are left to principles and analogies; and I have found it necessary to go somewhat carefully through the cases so far as they bear upon the learning of inherent covenants.
The leading authority' on this question, is Spencer’s case (5 Rep. 16), and putting all the cases which follow together, they form little more than a commentary on the seven resolutions there adopted by the court. Lord Coke says, in his report of that case; “ Reader, observe your old books; for they are the fountains out of which these resolutions issue';” but the wonderfully diligent and learned reporter has so far exhausted those books, that his injunction has seldom been obeyed by the most recondite among the bar or the bench. See all the resolutions in this case handsomely condensed, in Bally V. Wells (3 Wils. 27, 28), but without, the numerous and learned references in the original report by Lord Coke. The case itself was a covenant by the lessee for him, his executors (not assigns), that he, his executors, administrators or assigns, would build a brick wall on the demised premises. His assignee being sued, it was held that he was not bound, because the thing in respect to which the covenant was made, was not in esse, and had not yet become a part of the land. Its existence was in- contemplation. And yet it was agreed that because it was a thing that would directly affect the demised premises, if the word assigns had been used, the covenant would have bound the assignee. The assignee is to take the benefit of it, and shall be bound by express words (Grey v. Cuthbertson, 2 Chit. R. 482, S. P.) In the case at bar, there is not and never can be any' tangible connection between the factory demised and the not erecting another factory in the same neighborhood. The omission, however much it might add to (he value, could never become a part of the premises in the same sense with the unbuilt wall. If it be so, it is in virtue of the covenant; that is, of nothing to be done or omit-‘ed upon the land, physically speaking, as was said of the wall in the second resolution in Spencer’s case, and on which much stress was laid; and the resolution adds, “ if the thing to be done be merely' collateral to the land, and doth not touch or concern the thing demised in any sort, [148] there the assignee shall not be charged; as if the lessee covenants for 0 him and his assigns to build a house upon the land of the lessor which is no parcel of the demise, or to pay any collateral sum to the lessor or to a stranger, it shall not bind the assignee, because it is merely collateral, and in no manner touches or concerns the thing that was demised or that is assigned over.” Within the same distinction, a covenant by the lessor to repair, runs with the land, and the assignee of the lessee may sue the lessor for a breach. This is laid down in the fifth resolution. So of the lessee’s covenant to repair according to the sixth resolution. Of such covenants there is no doubt, for the thing is actually to be done upon the land. And in this all the cases will be found to agree. The Dean and Chapter of Windsor’s case (5 R. 24), *86 was in point to this case of repairs; and it was there resolved that the assignee is bound to repair, though not mentioned in the lease.
But it is obvious from extracts already made, that Spencers case never intended to confine the negotiable quality of covenants to those which respect some physical act or omission upon the land. Such a restriction would contradict a multitude of cases. In the Dean and Chapter of Windsor’s case, it is said that on a covenant by the lessee to discharge the lessor de omnibus oneribus ordinariis et extraordinariis, and to repair the houses, an action lies against the assignee. The restriction would also subvert the familiar doctrine that covenants for quiet enjoyment and warranty run with the land. In Bally v. Wells, as reported in Wilmot's Opinions, 341, 3 Wils. 25, S. C., Lord Chief Justice Wilmot comments at large on several resolutions in Spencer's case; and particularly on the instance of the house to be built on other land, or to pay a collateral sum of money; and he remarks, “the reason why the assignees, though named, are not bound, is because the thing covenanted to be done has not the least reference to the thing demised. It is a substantive independent agreement, not quodam modo, but millo modo, annexed or appurtenant to the thing leased.” In a subsequent part of [149] the opinion, he says, that to carry over the covenant to the assignee, where something is to be done de novo, not only must the assignee be named, but the covenant must respect the thing leased. Again, he says, such a dependent covenant is “an agreement to do or omit to do something which respects the thing on which it depends.” In contemplation of law, it then forms a part of or appurtenance to the premises; it enters into their value, if the covenant be on the side of the lessor, or the amount of the rent, which is itself a part of the land (Spencer’s case, 3d resolution). If the covenant be on the side of the lessee, all becomes land or its incident; and the incident, if not arrested or diverted, or separated by some extraneous act, follows as necessarily into the hands of the assignee, as if it were the principal. Much is said in all the books concerning privity. If the covenant stands detached from the land, or be merely collateral to it, there is no privity. We have instances in Spencer’s case, 3d resolution, if a man lease sheep, &c. for a time, and the lessee covenant to deliver them at the end of the time, that is personal. And the case is not varied, though that demise and covenant be inserted in a lease of land. It is equally disconnected; there is not that privity, says the resolution, which is necessary. What would have made that privity? Wi'mot, C. J., in Bally v. Wells, answers the question: “ The covenant must respect the thing leased, which I consider as the medium creating the privity between them. The chose-in action, which of itself is not assignable, loses that property under those circumstances, and in a waiting, dependent state, follows its principal. Covenants which run and rest with the land, lie for or against assignee at the common law, though not named. They stick so fast to the thing on which they wait, that they follow every particle of it.” The privity need not always arise from the original relation of landlord and tenant, though assignable covenants are much more numerous there. The instance put in Spencer’s case, 3d resolution, is of that kind; but in truth it often stands independent of such relation, and prevails to some extent between vendor and purchaser, or the owner of an absolute estate and the grantor of some incident which permanently [ 150] improves the estate. Wliy do charters and covenants for assurance and warranty, and the like, follow the land ? Because they make a part of its value. Any one would give more for a warranted farm than a succession of'quit claim deeds. Fitzherbert, in his abridgment, p. 181 of the folio, and 420 of the Dublin ed. of 1793, says: “ If at this day a man granteth to one common of estovers, or of turbary in fee simple, to burn in his manor by that grant it is appurtenant to the manor, and if he make a feoffment of the manor, *87 the common shall pass to the feoffee;” and he introduces several instances of ' the same kind. In the example put by the 2d resolution in Spencer’s case, of the lessee covenanting to build on other land of the lessor, or pay a collateral sum of money, it must be apparent that these acts be entirely disconnected with the idea of their being a rent or compensation for the use of the premises; otherwise they will be taken as a part of the rent and run with the land. This I take to be perfectly settled by Vyvyan v. Arthur (2 Dowl. & Ryl. 670; 1 Barn. & Cress. 410, S. C.) That was a demise of certain land at a money rent, and beside that, the lessee covenanted for himself and assigns, that he would grind all the corn grown on the premises at the lessor’s mill, standing in the neighborhood; and the court held that as long as the mill and the reversion remained in the same hands, the covenant should go with the lands. So of a covenant on the side of the lessee to insure premises situate within the weekly bills of mortality, because an act of parliament had provided that the lessor might take and appropriate the avails of the policy to rebuilding the premises destroyed by fire (Vernon v. Smith, 5 Barn. & Ald. 1, in which the rules in Bally v. Wells were reconsidered and reaffirmed). B^jey, J., says, if the covenant be coextensive with the estate demised, and respect the thing, and be made with the party and his assigns, it passes. Best, J., puts another test; the covenant is beneficial to the owner as owner, and no other person, and thus benefits the estate like a covenant for renewal, which runs with the land, as said by Gawdy, J. in Moore, 159, and see 3 Wils. 29. The distinction has come down to us from very ancient times in the Year Book of 42 Ed. III, 3. The authority is settled at large in Spencer’s case. [151] It is briefly, that a covenant for him and his successors, by the prior of a covenant (a corporation having perpetual succession) with the lord of a manor and his heirs to sing all the week in a chapel parcel of the manor, ran with the land, and passed to the alienee of the manor; though it would have been otherwise if the covenant had been to say divine service in the chapel of another; for the covenant in such case can not be annexed to the chapel, because the chapel does not belong to the covenantee, as is adjudged in 2 Hen. 4; 6, b. The court proceed much upon that case in Vyvyan v. Arthur, which was decided so late as 1823. A case recently decided by Chancellor Walworth, though he did not stop to consider the authorities, fully accords with these distinctions; and indeed comes so near the case at bar, that it is impossible to see any difference in principle. A man conveyed land in a village adjoining a street or open place, called a public square, which he had dedicated to the public as such, and covenanted not to build on the dedicated ground. The grantee sold to another, who brought his injunction bill to restrain the original grantor in an attempt to build contrary to his covenant; and it was held that the covenant ran with the land into the hands of the owner, who was therefore a proper party to the bill (Watertown v. Cowen, 4 Paige, 510, 414). This case is the stronger as standing upon the abstract nature of the covenant at common law. It was not within the statute, for it did not concern landlord and tenant. It was a case of forbearance off the demised premises, and yet being annexed by the covenant, that made a case of privity according to Bally v. Wells.
In the case at bar the covenant is still more material. It is not to avoid doing what would be a mere matter of inconvenience or offence to good taste; but what might very materially impair the factory lot demised to Delacroix, for business purposes. The rent was doubtless large in proportion; and the benefit would attend the lessee and all his assignees, whether immediate or remote, during the term. The covenant respected the premises; it regulated their value, it fixed the amount of rent, it was coextensive with the estate it benefitted the owner of the demised premises, and no body but the owner *88 So far it would, I think, be a plain departure from principal and analogy tc, deny the assignee's action on this covenant.
I venture to say that there is no well considered case opposed to the character which the authorities so far go to fix upon the defendant’s covenant. There are. certainly cases which seems startled at the comprehensive rules concerning assignable covenants, and which therefore seek to limit the number; and there are others which enable us still more clearly to see the legal partition between real and collateral covenants. It is not to be denied, however, that they still leave the application of old principles to new cases, a very nice exercise of the mind, and remaining in greater degree a matter for judicial discretion than almost any other of equal importance in the law of property.
It was supposed by the counsel for the plaintiff, that our revised statutes, (1 R. S. 747 of old and 739 of 2d ed. §23, 24), re-enacted from 1 R. L. of 1813, 363, 4, § 1, 2), cover the whole ground, and make every covenant in a lease indiscriminately assignable. They say, in terms, that the assigns of a lessee shall have the same remedy by action against the lessor, &c., for the breach of any covenant or agreement in the lease, as the lessee himself might have had. These acts, however, are but substantial transcripts of the 1st and 2d sections of the statute 32 H. 8, ch. 34, passed on the dissolution of the monasteries, 5 Fick. Statutes at Large, 48. Spencer's case was decided in the 25 Eliz. and concludes with a resolution that the statute was confined to covenants touching or concerning the thing demised, and did not extend to collateral covenants. Indeed any other construction would make all covenants negotiable, if the parties would only take the precaution to insert them in any indenture of demise. It would confound all distinction between covenants real and personal and fasten an endless number and variety of incumbrances upon leasehold property; though it would certainly have saved Lord Coke and the judges in Spencer's case, and many since, much labor in maintaining an intent of the legislature imperfectly expressed. The [153] difficulty seems to be inherent in the subject, whether it be handled by legislators or judges; and yet the proper distinction must be maintained as far as possible.
in Keppell v. Bailey (2 Mylne & Keene, 517; 1 Coop. Sel. Cas. 298 S. CS), it was held that a covenant by the lessees of Beaufort iron works, though made for themselves and their assigns upon full consideration, with a rail road association, to take all the lime stone, &c., necessary for their works, by a course of transportation on the road from Treval quarry, at a certain toll, was collateral. The assignees of the works refusing to abide by the agreement, the association filed their bill to compel a performance. Lord Chancellor Lyndhurst thought the covenant void, as being for a toll higher than allowed by statute; but the question was fully argued whether this was such a covenant as ran with the land, and would therefore subject the assignees, however it might operate upon the original covenantors, and he held it to be a mere personal covenant. He went through with the case first on principle, and then on all the cases which appeared to make against him, criticising them with great freedom. The objection raised on the ground of perpetuity did not strike him with any force, because there were persons in existence who could release or discharge the incumbrance; and there was some doubt whether the word assigns applied to the assignees of the lessees, or only those of the shareholders; but the case was finally put by him on the ground that the covenant did not pass; a question which was very fully discussed. Going on principle, he recognizes the right to create easements and attach them to lands in fee, I have instanced common of estovers, &c., from Fitzherbert. The Lord Chancellor adds ways; and as late as 1691, it was held that a covenant with one and his heirs, to allow *89 him a water course through the land of the covenantor, ran with the land, and would be specifically enforced in equity (Holmes v. Buckley, 1 Eq. Cas. Abr. 27, F. 4). They are, he says, incorporeal hereditaments known to the neighborhood, limited by the law and familiarly dealt with by its principles. They can not be multiplied. “ If one man may bind bis land to take lime from a particular kiln, another may bind his to take coal from a [154] particular pit, while a third may load his property with further obligations to employ one blacksmith’s forge, or the members of one corporate body in various operations upon the premises, besides many other restraints as infinite in variety as the imagination can conceive; for there would be no reason whatever in support of the covenant in question, which would not extend to every covenant that can be devised.” He qualifies and distinguishes the case from the Year Book. The chantry had existed time out of mind; the chapel belonged to the covenantee; the defendant, being a corporation, it was not necessary to say that it would pass as a charge on the land in the hands of an assignee, but only, that it was assignable on the side of the covenantee; the feoffee was of the blood of the covenantee. But laying all these things aside, he would not allow that such covenants can be extended to new objects, such as stipulations to carry on certain occupations or trades by a settler on the manor. Such covenants can not be allowed to impress their obligation upon the land, but must be confined to the covenantor and his assets after his death.
So far as his lordship’s remarks extend to the covenant before him, and others by absolute purchasers, and others to do certain acts of business or forbearance, or allow certain privileges to covenantees and their assigns, all being disconnected with the relation between landlord and tenant, the restrictions, which he seeks to impose are reasonable, and not in direct con-' fliet with any of the adjudged cases; certainly not with those which relate to the rights and liabilities of the assignees and lessors and lessees. The statutes cited relate to these, and are broad enough, taken literally, to give assignees a remedy on every possible covenant contained in a lease. These statutes transfer the privity of contract (Thursby v. Plant, 1 Saund. 237). The lord chancellor himself remarks, that “ the difference is obviously very great between such a case as this [the one he was considering] and the case of covenants in a lease, whereby the demised premises are affected with certain rights in favor of the lessor.” I need not say that the remark may, under the statute and all the cases, be invested and applied to [155] rights in favor of the lessee. True he says afterwards, that it would require but little attention to the cases to satisfy us, that even where the privity of lessor and lessee exists, there are bounds so narrow to the province of real covenants as would make the one in question lie on the extreme verge of it, if it did not fall without it. He certainly expresses himself a little more strongly afterwards; but he no where takes it upon him to say, with confidence, that the covenant fell without; and he might, after what he had said, and perhaps properly said, of the limitation under which other cases are to be taken, have dismissed all those which relate to the assignees of lessors and lessees, as inapplicable. He does so with Spencer’s case ; and Tatem v. Chaplin (2 H. Black. 133), which was a covenant to reside on the land, also with Jourdain v. Wilson (4 Barn & Ald. 266), which was a covenant by the lessor to supply the house demised with water at a given rate. That case is certainly much in point to the case now in hand, unless, as his lordship thinks in another part of his opinion, it be quite material that the act covenanted for should be done on the land. I have only to repeat that this can not be so. He dismisses Vernon v. Smith, already cited, and Bally v. Wells, which he cites from 3 Wils. 25, and Webb v. Russell (3 T. R. 393), upon the same distinction.
*90 Then what are the adjudged cases upon collateral covenants between lessor and lessee? for surely Keppell v. Bailey does not amount to one. The leading case is doubtless that of the The Mayor of Congleton v. Pattison (10 East, 130). In the lease of a mill, the lessee covenanted for himself and his assigns not to employ in his labor at the mill, persons settled out of the parish. This was held to be collateral and not binding on the assignee. It was insisted that such a covenant would benelit the premises at the end of the term by saving them from increased taxation for the poor introduced by a violation of the covenant. Lord Ellenborough, C. J., inquired whether the court could see with certainty that the value of the demised premises or of the reversion was to be affected during the term by an increase of [156] population, even suppose that to be the consequence. He admitted that other lands of the plaintiffs might be, and in finally delivering his opinion he admitted that if.the covenant affected the value of the thing demised it would pass. He asks how it could do that? and goes on at considerable length to cast round and inquire. The other judges agreed that .the land must be affected, and Bayley, J., insists that the covenant must, in order to make it assignable, be of a thing to be done on the land. He says a covenant by the lessee to make a way from the premises through other persons’ land would be collateral, though it might increase the value of the premises by opening a way to the market. That is a dictum both in the principle and illustration which certainly can not stand for law since the case of Vyvyan v. Arthur. Is it not obvious that such labor being inserted in the lease is in nature of a rent, the covenant to pay which always runs with the land ? The contrary may be stated or otherwise appear in the lease, find then the intendment would be overcome. Of course it would be collateral in such a case, or in other words, a mere personal covenant disconnected with the demise. In arguing Vyvyan v. Arthur, Pollock stated Purfrey's case, where the lessee of a tavern covenanted to account with the lessor monthly for the wine sold, as one not running with the laud, and so adjudged. Best, J., distinguished the covenant as one for good will merely. That case is reported in Godbolt, 120, and Moore, 243. In the first it appears that the lessee was to pay so much per ton sold, which was plainly in the nature of a rent. No judgment is stated to have been' given; but God-bolt says the better opinion of the court was that the covenant was collateral. Moore states the case as merely argued, but not .decided. The covenant, as there stated, was with the lessor and his assigns to keep the premises occupied as a wine tavern, and account monthly and pay thirty shillings a ton for wine sold. - It was plainly a case of a covenant to pay rent, and of course would pass. How the case was adjudged in the end does not appear. It was put too strongly by counsel in Vyvyan v. Arthur, when he called it ivas an adjudged case.
In Collison v. Lettsom (6 Taunt. 224, 229), the lessor covenanted out of his estate to give the lessee the pre-emptive right to certain land lying adjoining to the demised premises. It was admitted by counsel and assented to by the court, that the covenant was collateral and did not run with the land. The whole was obiter, as the case went off entirely on another point. In another report of the same case (2 Marsh, 1, 4), the point is simply mentioned as being agreed by the counsel on both sides, and the court as deciding the case on another ground. It was a case referred by the Lord Chancellor. Here the same difficulty existed as in The Mayor of Congleton v. Pattison, in seeing how the demised premises were to be enhanced in value to the party who sought the benefit of the covenant, no such consequence could be apparent from the face of the demise. The pre-emptive price might be more than the land was worth; and the offer just at the close of the term, But the point was not raised and passed upon. It is *91 enough to say that in this and the like class of cases, it was difficult and indeed impossible to see how the covenant was a leasing one, or any thing respecting the leased premises more than the most distant and distinct matter. Another like case is that of Dekins v. Latham (Sty 316), which was a condition sought to be drawn under the statute (32 Hen. 8, ch. 34, wrongly cited, c. 14), which stands on the same distinction with a covenant. It was the case of a lease complete in itself, with a reservation of rent; and then a covenant to pay a fine on the death of a third person, in annual sums over and above the rent, with a clause of forfeiture. This condition was held not available to the assignee of the reversion, because it was collateral. It was plainly a mere gambling condition on the life of the third person. The rent was only Ü3 per annum for 21 years and the fine was ¿6125, at ¿65 quarterly. The installments might overrun the whole term, in the time of their payment.
There are certainly some evils to be apprehended from a specific execution of these covenants in a court of chancery, beyond what might arise from leaving them to take their course at law. In the latter case, [158] they would end with personal damages. The court of chancery may-go farther, and impress them upon the land by decreeing specific execution, or by a perpetual injunction. In Taylor v. Owen and others (2 Blackf. 301), Owen had sold all his stock in trade and rented his store at New Harmony, in Indiana, to the plaintiff Taylor, for a term of years, and being the owner in fee of the whole settlement, covenanted with Taylor that he should have the exclusive right of trade for the settlement. Taylor was to pay a rent for the premises and privilege contracted for. It does not appear that the assigns of either party were mentioned. Owen afterwards let to Rogers who underlet to Moffatt, without restriction as to trade; and Moffatt opened a store. Taylor filed his bill 'against all three to restrain the trade. The injunction was denied as to Moffatt, Blackford, J., saying the covenant did not run with the land. No authorities are cited. The restraint on trade was quite extensive, assigns were not mentioned, and the remedy sought was a severe one. Doubtless the court were right in refusing to interfere on more grounds than one. No statute is mentioned as influencing the effect of such assignments. Looking at the parties and their assigns in a court at law-, and saying that a covenant by a lessor in favor of a lessee and his assigns for an exclusive trade within such boundaries as the law would allow upon principles of policy, should not avail the assignee, at least against the assignor, and indeed his assignees of the reversion, would seem to me in conflict with the almost unbroken current of English and American authority. There may be various grounds in this, as in other cases, why chancery should withhold its extraordinary aid. It will then leave the parties to their legal remedy. I do not see the necessity in the case cited, for saying that the covenant did or did not run with the land. It might be necessary to say it should not run with all the land of Owen—the whole township. But neither Rogers nor Moffatt was the assignee of any reversionary right which Owen had. He still retained that, and as yet had no assignee to be made liable.
On the whole, I think this action is sustainable as upon an inherent covenant, at least one that will pass by express words. In Grey v. [159] Cuthbertson, before cited from 2 Chit. R. 482, the covenant was by the lessor, but not for his assigns, to take and pay for all fruit trees and bushes growing at the end of the term which the lessee should plant. The assignee of the lessor was held not to be liable for want of the word assigns; though it was admitted that this word would have charged him. The decision was on the distinction in Spencer's case, that the thing did not exist at the time of the covenant.
*92 I now proceed, as [ proposed, to inquire more particularly at what time was the covenant now before us broken ? When did the cause of action arise?
The defendant’s covenant was, that the lessee and his assigns should enjoy the demised premises in a certain way, or under a certain exemption from competition in their business. The covenant was oiie for quiet enjoyment with specific advantages which were under the control of the lessor. We have assumed that such a covenant is not broken till by the act or the gross negligence of the lessor, those advantages are actually subtracted That is an ouster pro tanto, which then first becomes a cause of action. The covenant was then broken and not before. It was broken while it belonged to the plaintiff as the assignee; and therefore the objection that he purchased a chose in action, does not apply. To doubt the defendant by his lease to the Paddocks departed with the power to fulfil liis covenant; and in general, this is held a breach. Sir Anthony Main’s case, 5 R. 20; Moore, 422, S. C. by name of Maine v. Scot; Cro. Eliz. 449, 479, S. C. by name of Scot v. Sir Anth. Mayn, and Sir Anthony Manie v. Scot; Poph. 109, S. C. by name of Scot v. Sir Anthony Mainy, 2 Anderson, 18, case XII, S. C., was pressed upon us at the argument, as in point, to show that the lease was, therefore, per se, a breach. In Sir Anthony Main's case, the lessor had covenanted with the lessee, that, on certain conditions, the former would renew the lease during the term. But he sold and conveyed the re-[160] version, thus disqualifying himself; and it was held to be a breach of the covenant, so absolutely and directly, as to'dispense with the performance of all condition on the part of the lessee. That case is doubtless law; and so, I believe, has always been holden. It underwent great consideration, both in the O. B. and K. B., on error; but the covenant related to the title, and not merely to the possession or manner of enjoyment. It implied that the lessor should always retain the power to make the additional estate; whereas covenants relating to the possession, such as warranty and covenants for quiet enjoyment, are never broken till an actual ouster. A failure of title is not enough (Waldron v. M’Carty, 3 Johns. R. 471; Kortz v. Carpenter, 5 id. 120; Sedgwick v. Hollenback, 7 id. 376; Vanderkarr v. Vanderkarr, 11 id. 122). They differ from covenants of seizin "and those against incumbrances and the like, which go to the title (Greenby v. Wilcocks, 2 Johns. R l; Abbott v. Allen, 14 id 248; Hall v. Dean, 13 id. 105). If a covenant for quiet enjoyment of the whole land be not broken without actual ouster, a fortiori, is not a covenant that he shall not be let, hindered or disturbed in any particular part or to any particular extent or profit. In this case, the action is not in either count for the mere letting of the stream to the Paddocks. That would not be enough to make cut a breach; nor is it averred that the letting was for the express purpose of veneering; nor is there any such proof. The whole action both in respect to the pleadings and evidence, goes upon the actual disturbance. It is on the latter clause of the covenant that the defendant should not establish the place for sawing mahogany. Surely that was not done till the mill was put in motion; or the lessee or his assignee, the plaintiff, had felt the consequence, or at least till the mill was actually erected with the avowed intent to employ it for that purpose. I admit there is some nicety in the distinction between covenants going to the title and those which go to the enjoyment; but it is well established, and it is our duty to follqvv the principle on which it proceeds [161] as nearly as we can. There is a reason for the difference. Breaches of those which go to title are capable of being measured in their consequences at once. Those breaches going to possession merely, can not be known or estimated except by their actual operation. A similar distinction prevails between a bond of mere indemnity and one which goes to the existence of a fact, or imposes some specific or certain duty. Sir Anthony Main’s *93 case was debt on bond for the performance of the covenant to renew; a total and absolute departure with the title, by breaking the covenant in the indenture, was holden to work' a forfeiture of the bond.
Ought the opinion of witnesses to have been received as to the amount of damages?
The proposition, as I understand it, was to take the abstract opinion of the witnesses on an examination in chief, subject only to the right of cross-examination. It was not pretended that the knowledge of .both or either covered the whole ground, or if it did, they were not confined to such knowledge. They were at liberty to speak from facts known to them; and equally so, for aught I see, to what had been proved by others, and even to go into the regions of speculation and guess upon the whole amount of damages. It was certainly a question resting upon very complicated premises, as is evident from the numerous witnesses and the multifarious proof on the trial. What amount of business did the plaintiff's factory in truth perform? What was the extent of local demand for work ? What was the style of his workmanship; good or bad? If such as to command custom, then to what extent would his power, his time and other means reach? Was he sober and industrious? What deductions from his profits were made by the operation of the rival factory? or if that were out of the way what would be done by others either already established, or which would be established? With many other facts to which, at least to all of which, no individual could speak from actual knowledge. The ordinary, and in general, the only legal course is, to lay-such facts before the jury as have a bearing on the question of damages, and leave them to fix the amount. They are the only proper judges. They are impartial, and capable of entering into these ordinary matters. Witnesses are, in such cases, unavoidably governed by their feelings, and [162] their prejudices gathered from many sources. This was not a matter of science. That I admit forms an exception to the general rule, that facts, not opinions, must be received; the facts relevant to the question before the jury. What is opinion upon a matter of science? Even that does not rest in the abstract. It is founded on a knowledge of facts; of causes and their effects uniform in their connection. In Folks v. Chad (3 Doug. 157), Mr. Smeaton, the engineer, was called to speak to the effect of an embankment on Wells Harbor. It had decayed soon after the bank was erected, and nobody knew the cause. Mr. Smeaton was called to speak to it. That was objected to, and he was rejected at nisi prius. On motion for a new trial, Lord Mansfield, C. J., said, “a confusion now arises from a misapplication of terms. • It is objected that Mr. Smeaton is to speak not as to facts, but as to opinion. That opinion, however, is deduced from facts which are not disputed—the situation of banks, the course of tides, and of winds, and the shifting of sands. His opinion, deduced from all these facts, is that, mathematically speaking, the bank may contribute to the mischief, but not sensibly. Mr. Smeaton understands the construction of harbors, the causes of their destruction, and how remedied. In matters of science, no other witness can be called. An instance frequently occurs in actions for unskilfully navigating ships. The question then depends on the evidence of those who understand such matters; and when such questions come before me, I always send for some of the brethren of the Trinity House.” After giving several illustrations, he adds: ‘"Therefore, we are of opinion that his judgment fonned on facts, was very proper evidence.” Such are the principles of receiving scientific opinion: the only evidence of the kind I venture to say which can be received. It must in its very nature be confined to scientific men, extensive and trained observers, deriving skill from professional experience, or something in the nature of it. I can perceive no analogy between such a case and the one at bar. Surely there can be nothing like science in ascertaining *94 the loss of this plaintiff from a rival factory. After hearing particulars one man can reckon up the amount as well as another, though none with perfect accuracy. That is no reason for receiving opinion; but a very powerful argument against it. The single opinion of no man can be followed. The best would be utterly delusive. Even where a witness is able to speak to all the facts of the particular case, his opinions are not to be received. I know that in questions of insanity, some courts allow witnesses to throw in their opinions from what they hai e seen and heard. But I always ftymd that such cases were much better tried, where opinions were kept entirely out of view; and I have generally excluded them, except where .they came from professional men. The little consideration due to such testimony is shown by the present chancellor, in Clark v Fisher (1 Paige, 173). A kindred practice has prevailed of allowing witnesses from their own observation of individuals, to give opinions as to the state of their affections, in actions of criminal conversation (Trelawny v. Colman, 2 Stark. R. 191); and breaches of marriage promise (M'Kee v. Nelson, 4 Cowen, 355). But the witness is confined to facts within his own knowledge, his own actual observation. All such cases are exceptions; and they ought not rashly to be multiplied even under the limitation imposed; for it is impossible to say that the witness is speaking altogether from facts which he personally knew.
No case was cited by the counsel for the plaintiff, where evidence of opinion, as to the amount of- damages sustained, has ever been sanctioned as legal. The amount of indemnity, where it is not capable of being reached by computation, is always a question for the jury. If there be any rule without exception, it is this; and I have been unable to find any instance where the opinion of witnesses has been received. Bacon and Symonds, who were sworn in this case, might have possessed some knowledge in respect to the case peculiar to themselves. Every witness is supposed to have such knowledge; but he does not therefore become an expert, and entitled to speak on the general point of damages. If one may speak, another may. It is no reason for receiving such evidence that the defendant may cross-[164] examine. That he might do of course; and the trial might thus be protracted to an amazing length in taking opinions from the neighborhood. For aught I see, the question would have been equally proper, if it had been addressed to a majority of the witnesses actually sworn on the trial.
I think the cause must be re-tried on this question of damages.