WEYMAN'S EXECUTORS *vs.* RINGOLD.

*In the matter of the Accounting of the Executors of* ABNER WEYMAN, *deceased.*

A DIRECTION to executors to invest $4,000, and apply the interest to the support of M. and R., till they respectively attain the age of 21, and then to pay the principal to them or their assigns in equal moieties, creates a vested legacy in each of the donees, in a moiety of the sum, payable on attaining majority. If either of the legatees die before the time of payment, the bequest passes to his personal representatives.

When the particular fund is directed to be severed from the estate, the interest applied to the use of the legatee, and the principal paid at a future time, the legacy is considered as vested, and the time of payment only postponed.

A gift over of a legacy on a contingency, does not prevent the vesting, but can only operate to divest it, upon the happening of the precise contingency specified by the testator. Such limitations are conditions subsequent, and are strictly construed.

A legacy of $4,000 to two persons in equal moieties, and " in case they shall die without leaving lawful issue before they attain the age of 21 years," that " the said money" shall fall into and become a part of the residuary estate of the testator, does not, on the decease of *one* of the legatees before majority without issue, carry the share of the one so dying to the survivor, nor to the residuary legatees, because the exact event upon the occurrence

of which the previous gift was to be divested, namely, the death of *both* before 21, has not happened.

A covenant to pay to W., " his executors, administrators or assigns," one half the *value* of a party wall, about to be built by W., at the time of its use by the covenantor, and an express agreement that the covenant shall bind the lands and the owners thereof, for the time being, enures to the benefit of the grantee of the land of the covenantee, and the executors of the covenantee have no interest therein.

MARSHAL S. BIDWELL, *for the Residuary Legatees.*
HORATIO BOGERT, *for the Executors.*

THE SURROGATE. The testator, Abner Weyman, after giving by his will, a legacy of $1000 to his niece, Caroline Matthews, " and her assigns," made the following bequest : " Item, I do direct my executors, hereinafter named, to put out at interest on bond or bonds, to be secured by mortgage or mortgages on real estate, the sum of four thousand dollars, and to pay and apply the interest thereof as the same shall be received, to the support and maintenance of my great niece and great nephew, Mary Ringold and Richard Ringold, the children of the above-named Caroline Matthews, until they shall respectively attain the age of twenty-one years, and upon their so attaining the age of twenty-one years, to pay the said principal moneys to them or their assigns in equal moieties ; and in case they shall die without leaving lawful issue before they attain the age of twenty-one years, that the said money shall fall into and become a part of the residue of my estate." After making other bequests, the testator gave and devised all the rest, residue, and remainder of his estate, real and personal, to his children.

Richard Ringold died on the 27th of May, 1847, aged nineteen years, without issue and unmarried, leaving his mother and sister surviving. His sister, Mary Ringold, was born May 15, 1830.

Upon this state of facts, I am required to determine whether the moiety of $4000, directed to be paid to Rich-

ard Ringold, on attaining the age of 21 years, by reason of his decease before that period, survived to his sister Mary Ringold, or passed to his personal representatives, or fell into the residue of the estate.

It is necessary *in limine* to ascertain, whether or not the legacy to Richard Ringold, was vested. The general principle is well settled, that where the *gift* is absolute, and the time of *payment* only, postponed, time, not being of the substance of the gift, but relating only to the payment, does not suspend the gift, but only postpones the payment. (*Burril* vs. *Sheil*, 2 *Barbour's S. C. R.*, 458; *Patterson* vs. *Ellis' Executors*, 11 *Wendell, R.*, 259; *Jackson* vs. *Jackson*, 1 *Vesey, Sen.*, 217; *Bolger* vs. *Mackell*, 5 *Vesey*, 509.)

Where, however, the legacy is given *at* 21, or *if, in case, provided*, or *when*, the legatee attains that age, time may be of the substance of the gift, and if so, the bequest does not vest till the event happens. So, also, where there is no gift, but by a direction to executors to pay or divide, and pay at a future time or on a certain condition, the vesting may not take place, till the time arrive or the condition be performed. (*Leake* vs. *Robinson*, 2 *Meriv.*, 387; *Booth* vs. *Booth*, 4 *Vesey*, 399; *Ford* vs. *Rawlins*, 1 *Sim. & Stu.*, 328; *Vize* vs. *Stoney*, 2 *Dr. & W.*, 670; *Breedon* vs. *Tugman*, 3 *My. & K.*, 289.)

But there is an important distinction to be observed in those cases, where the gift is to be *severed* instanter from the general estate for the benefit of the legatee, and the interim interest is to accumulate or to be applied to the support of the beneficiary. A bequest, which from being given when the legatee attains 21, or which from being a mere direction to pay at that time, might not be held a vested legacy, becomes vested, when coupled with a provision for the severance of the fund from the bulk of the estate, and an intermediate accumulation of the interest or the application of it, for the benefit of the legatee. These circumstances are considered as controlling indications of the testator's intention, that the legatee should at all events have the prin-

cipal, and is only to be deferred as to the time of its payment. Such legacies have, therefore, been held to be vested. The doctrine is based upon sound reasoning and is well established. (*Fonereau* vs. *Fonereau*, 3 *Atkyn*, 645 ; *Hoath* vs. *Hoath*, 2 *Bro. C. C.*, 4 ; *Walcott* vs. *Hall, Ibid.*, 305 ; *Hanson* vs. *Graham*, 6 *Vesey*, 239 ; *Branstrom* vs. *Wilkinson*, 7 *Vesey*, 421 ; *Vivian* vs. *Mills*, 1 *Beavan*, 315 ; *Greet* vs. *Greet*, 5 *Beavan*, 123 ; *Parker* vs. *Golding*, 13 *Simon*, 418 ; *Milroy* vs. *Milroy*, 14 *Sim.*, 48 ; *Hammond* vs. *Maule*, 1 *Coll.* 281 ; *Saunders* vs. *Vautier*, 1 *Cr. & Ph.*, 240 ; *Lister* vs. *Bradley*, 1 *Hare*, 10 ; *Packham* vs. *Gregory*, 4 *Hare*, 397.)

On the application of this rule to the present case, I find that although there was no absolute, direct gift in express terms, to Richard Ringold, yet the directions of the testator, as to the severance of the sum of $4000 from the estate, its investment, the application of the interest to the support of Richard and Mary, and the payment to them of the principal fund on their severally attaining majority, are strong and decisive circumstances, evincing an intention to make the gift vested.

As to the nature of the estate in this legacy, belonging to Richard Ringold, at the time of his decease, there can be no difficulty, after ascertaining that it was vested, in determining its legal character. The executors are directed to pay the $4000 to the two legatees, " in equal moieties," " upon their so (*i. e.*, 'respectively,') attaining the age of twenty-one years." Nothing is more firmly settled than that a devise or bequest to a number, by any mode of expression which denotes a severance, vests in the devisees or legatees, as tenants in common and not as joint tenants. (*Heathe* vs. *Heathe*, 2 *Atkyn*, 122 ; *Norman* vs. *Frazer*, 3 *Hare*, 84 ; *Lashbrook* vs. *Cock*, 2 *Meriv.*, 70 ; *Richardson* vs. *Richardson*, 14 *Simon*, 526.) Where there is a gift to children when they arrive at the age of 21, those who reach that age will necessarily take as tenants in common, even though no words of division are used, because lega-

tees who are to take at different times, cannot take as joint tenants. (*Woodgate* vs. *Unwin*, 4 *Simon*, 129.)

Here the time of payment is not only different as to each legatee, but there is an express provision for the payment of the fund to the legatees in " equal moieties," that is, $2000 to each, as they severally arrive at 21. It is, therefore, a clear case of tenancy in common. (2 *Powell on Devises*, 370, 371; *Williams on Executors*, 1253-4.) Richard Ringold having died under 21, without leaving issue, the next point that arises, relates to the disposition of his moiety. Had the testator, after directing his executors to pay Richard and Mary their shares, on their respectively attaining the age of 21, then stopped, there could have been no doubt, that on the decease of either of the legatees under that age, his or her share being vested, would have passed to his or her personal representatives. The testator, however, does not stop at that point, but proceeds in these words, " and in case they shall die, without leaving lawful issue, before they attain the age of 21 years, the said money shall fall into and become a part of the residue of my estate." The first consideration suggested by this clause is, whether it affects the result just attained, as to the vesting of the legacy. I think not. If the terms of a gift are sufficient to vest it, a further gift of the same thing over on a contingency, does not prevent the vesting. On the contrary, a devise over has been held to afford an argument in favor of an immediate vesting. Thus, a devise of real estate to a person, if he should attain a particular age, standing alone would be contingent, yet if it be followed by a limitation over in case he dies under such an age, the devise over is considered explanatory, and the first devise is held to vest instanter, subject to be divested on the occurrence of the contingency; the limitation aiding to show an intention, to give to the primary devisee, whatever estate was not given over. (*Doe* vs. *Moore*, 14 *East.*, 601; *Doe* vs. *Ward*, 9 *A. & E.*, 582; *Bradley* vs. *Barlow*, 5 *Hare*, 594; *Murkin* vs.

*Phillipson*, 3 *My. & K.*, 257; *Jarman on Wills*, 738, 758, 774; *Leeming* vs. *Sherratt*, 2 *Hare*, 22, 23.)

Every rule of construction, then, contributing to establish Richard Ringold's interest in this fund as vested, it remains to be seen how it can be taken from him. The reasonable supposition would be, that the legatee can be deprived of his bequest in no other way than that pointed out by the testator. Mary Ringold claims it on the ground that the limitation over, being of the whole fund, and on the contingency of the death of *both* under 21, without issue, she has by implication a right of survivorship in Richard's share. On the other hand, the residuary legatees insist, that the words fixing the event upon which the fund is to fall into the residue, are to be interpreted distributively, and on the death of either of the legatees under 21, without issue, the residuary legatees take such share.

My first difficulty with regard to the claim of Mary Ringold is, that bequests to a class as tenants in common may possibly, as in *Currie* vs. *Gould*, 4 *Beavan*, 117, admit of survivorship by implication, but not so with bequests to individuals *nominatim*, where the legacies are vested. (*Bolger* vs. *Mackell*, 5 *Vesey*, 509.) The case of *Mackell* vs. *Winter*, 3 *Vesey*, 536, was relied on as an authority in favor of this doctrine of implied survivorship, but that decision, while it has not been approved (*Skey* vs. *Barnes*, 3 *Meriv.*, 343), was placed by Lord Rosslyn expressly on the ground that the legacy was not vested, and also because, to use his own language, the will showed " a very clear, though not a very well expressed intention that there should be cross-remainders." (5 *Vesey*, 513.) In the case now before me, the legacy was vested, and there is no direct expression of an intention to create a survivorship. It is urged, however, that in analogy with the doctrine of implied cross-remainders, inasmuch as Richard's share cannot go to the residuary estate, unless both Richard and Mary die under twenty-one without issue, therefore, on Richard's death, his share must survive to his sister. This proposi-

tion overlooks the reason upon which the rule, in regard to implied cross-remainders, was established. In a devise to several devisees *in tail*, with a limitation over in remainder in case all the devisees die without issue, cross-remainders are implied, or a chasm would be produced in the limitations, inasmuch as some of the estates tail might be spent, though the limitation over could not take effect till the failure of all. Implication is not resorted to, unless a contingency arises, for which no provision has been made in terms. A devise of an estate tail, or of a life-interest in personalty (*Hatton* vs. *Finch*, 4 *Beavan*, 188; *McDermott* vs. *Wallace*, 5 *Beavan*, 142), does not cover all the testator's interest, and when, therefore, the first estate expires before the happening of some event upon which the property is directed to go over, it becomes necessary to inquire as to the probable intent of the testator, and to examine his language to see what may be *implied* therefrom. But "with respect, however, to limitations in fee of the reality, and of absolute interests in personalty (which are clearly governed by the same principles), as the primary gift includes the testator's whole estate or interest, and that interest remains in the objects in every event upon which it is not divested, a partial intestacy can never arise for want of a limitation over." (*Powell on Devises, Jarman's Ed., vol.* 2, *p.* 624.) In such a case the whole estate is disposed of, nothing remains as a subject for implication, and the primary gift being vested, it ought not to be taken away upon any mere probability, however violent. To introduce cross-limitations among the devisees, "would be to divest a clear, absolute gift of the testator upon reasoning merely conjectural." (*Ibid.*, 625.) The case of *Skey* vs. *Barnes*, was decided expressly upon this ground. It was there held, "that, with respect to personal property, if a share once vests, though liable to be divested, on a contingency, the question of reciprocal succession or survivorship never can arise. If the contingency happens, the share goes over; if the contingency

does not happen, the share remains vested, and passes to representatives." (3 *Meriv.*, 343.) In truth, the same difficulty meets Mary Ringold's claim by an implied survivorship, as that of the residuary legatees, who ask for the legacy on what they esteem to be a fair and liberal, though not a literal construction of the limitation to them. The legacy was vested in Richard, and is not to be taken from him, or those who represent him, by any hypothetical reasoning, however plausible, as to what might have been the testator's intention in the case that has happened. There is here no lapse or intestacy threatened, no chasm to fill, but, by giving the legacy absolutely to Richard, subject only to a single contingency, the testator has provided for every event, and has left open no room for implication. Even if it were possible to spell out from this will some indication of a design, on the part of the testator, to give the whole fund to the survivor, I should be bound to hold this legacy as vested, subject to being divested on the precise event upon which the right of survivorship had been made to depend. "The Courts," says Sir Edward Sugden, "have always been anxious that where the contest was between surviving, and the representatives of deceased children, the interest should vest in the deceased children, and where some of the children could take, the Court have struggled to let in all." (*Kimberly* vs. *Tew*, 4 *Dru & Warren*, 139.) In *Browne* vs. *Lord Kenyon*, 3 *Mad.*, 410, there was a gift in trust for several persons successively for life, and afterwards to pay the principal to C; but if he was then dead, then to his two brothers in equal shares, *or the whole to the survivor of them.* Both the brothers, and also C, died pending the prior life-interests, and it was held that both the brothers took vested interests, subject to being divested, if *one only should survive the tenants for life.*

In *Belk* vs. *Slack*, 1 *Keen*, 238, the bequest was upon trust for A for life, and after the death of A and B, over to C and D, to be equally divided between them share and

share alike, or "*to the survivor or survivors of them.*"
C and D both died in the lifetime of A and B, and it was
held that there was no survivorship, but their respective
representatives took the several moieties of the legacy.
These cases sufficiently illustrate the position, that survi-
vorship will not be implied so as to divest a legacy already
vested, unless the precise event happens in which the
testator has declared there shall be a survivorship. Such
a contingency has always been held to be in the nature of
a condition subsequent, on the occurrence of which one
legatee is substituted in the place of another. Conditions
subsequent are rigorously and strictly construed. Being
in defeasance of vested interests, Courts of Law and
Equity are exact in requiring the very event to transpire,
or the act to be done, with all its particulars, which is to
defeat the previous estate, or transfer it to a substituted
legatee. Such conditions admit of no latitude of construc-
tion, but should be interpreted literally, and when there is
a condition copulative, the whole must be performed before
the new estate can arise. (1 *Roper on Legacies*, 4*th Lon-
don ed., p.* 618; *Harrison* vs. *Foreman*, 5 *Vesey*, 207;
*Smither* vs. *Willock*, 9 *Vesey*, 232; *Davidson* vs. *Dallas*,
14 *Vesey*, 576; 1 *Jarman on Wills*, 750; *Sturgess* vs.
*Pearson*, 4 *Mad.*, 411.)

It is abundantly manifest, therefore, that I must decide
against the claim of Mary Ringold to the share of her
deceased brother, on the ground of an implied survivor-
ship; and it only remains to see whether the title of the
residuary legatees is any better. The inquiry is this: Has
the event happened, in which, the testator has declared that
Richard's share should be divested, and fall into the resi-
due of his estate? The language of this limitation is,
" and in case they shall die without leaving lawful issue
before they attain the age of twenty-one years, the said
money shall fall into and become a part of the residue of
my estate." An important criticism, naturally suggested
by the phraseology, is, that the bequest over is of the entire

fund, and not of the share of each legatee as it falls in. One of the controlling grounds warranting the implication of cross-remainders, is, in the language of Sir James Wigram, " that the testator has clearly intended, by the very expression he has used, that the estate should go to the heir at law, or remainder-man, as one entire estate, at one time, and not by fractions, and that the event upon which the estate was to go, was the failure of issue of all the devisees." (*Vanderplank* vs. *King*, 3 *Hare*, 1.)

In this limitation all the expressions used by the testator imply, that the event upon which the residuary legatees are to take, is the death of both Richard and Mary under twenty-one, without issue, and the sole subject-matter of the bequest over, is " the said money," words referring to the fund of $4000. " The said money" is to fall into the residue in case " they" shall die, that is, *both* of them, not *either* of them. A literal satisfaction of this language requires the death of both the legatees under 21, without issue, and the whole fund is to go over, not a fractional part of it, when that event occurs. If the words had been " in case *both* shall die," or " *Richard and Mary* shall die," &c., no doubt could be entertained as to the proper construction, and yet the word *they* of necessity means *both* Richard and Mary, referring as it does to the antecedent, and comprising all the persons referred to. The term, " the testator's said lands," is not strengthened by saying " *all* the testator's said lands." " The word ' all,' in truth, makes no difference in the sense," said Lord Kenyon in commenting upon such a clause, " for a devise over of ' the said premises,' or ' the premises,' or ' all the said premises,' means exactly the same thing." (*Watson* vs. *Foxon*, 2 *East.*, 36.)

It may be thought, however, that, the terms of the gift to Richard and Mary being such as to vest in them a tenancy in common, each in a moiety of the fund, payable on " their *respectively* attaining the age of 21 years," by the rule of construction, that you must proceed *reddendo*

*singula singulis*, the word "they" ought to be construed distributively. In questions relating to cross-remainders by implication in estates tail, there was at one time great stress laid upon the word "*respectively*," in the clause creating the estate in a number of persons, as evidence of intention that each share should go over, as it fell in, to the remainder-man or heir. (*Comber* vs. *Hill*, 2 *Strange*, 969 ; *Williams* vs. *Browne*, 2 *Strange*, 996 ; *Davenport* vs. *Oldis*, 1 *Atkyn*, 579.) Yet the cases which were founded on this doctrine are now clearly overruled. (*Powell on Devises*, 2, *p.* 611.) In *Phipard* vs. *Mansfield*, there was a devise to three, and the heirs of their bodies as *tenants in common*, and for want of *such* issue, to the right heirs of the testator. Lord Mansfield held that "*want of issue*" meant issue of *all* the tenants in common. (*Cowper*, 797.) The same doctrine was again asserted in *Atherton* vs. *Pye*, 4 *T. R.*, 710, and also in *Watson* vs. *Foxon*, 2 *East.*, 36, where the devise was to children and "the heirs of their *respective* bodies," as tenants in common, and for default of *such*, then over. (*Doe* vs. *Webb*, 1 *Taunton*, 237.) In opposition to this view, the case of *Gilbert* vs. *Witty, Croke, James*, 655, is pressed upon me as a decisive authority. The devise was of three houses to three sons, one house to each son and his heirs, provided if all should die without issue, all the said houses should remain to the testator's wife for ever. This created an estate tail, and the whole question was whether there could be cross-remainders by implication between more than two devisees, when the devise was to each severally by express limitation. On the death of one of the sons without issue, it was held, that his part should go immediately to the wife, " for there shall never be cross-remainders by implication between more than two devisees," and the devise being to "each of the sons severally by express limitation, there should not be any greater estate by implication." It seems to me quite a sufficient answer to this case, that both the grounds upon

which it is decided, have been overruled, as will appear from an examination of the authorities I have already cited in relation to cross-remainders. (*Green* vs. *Stephens*, 17 *Vesey*, 64.) But apart from this objection, *Gilbert* vs. *Witty*, is not in point; 1st. Because the primary devise gave estates tail which admit of cross-remainders; and 2dly. Because the primary life estate was already divested by death, and the Court having determined there could be no cross-remainders, there would have been a partial intestacy unless the wife took. On the contrary, under the will which is the present subject of discussion, the legacy is vested, and there is no possibility of intestacy. The truth is, that in *Gilbert* vs. *Witty*, the estate passed to the wife, because under the ruling of the Court, there was no one else to take it, and not because the word " all " in the limitation clause was construed distributively. If the same case were now presented for adjudication, there can be no doubt the decision would be the other way.

It was also urged on the argument, that it is absurd to suppose the testator, in case of Richard Ringold's death, did not intend his share to survive to his sister, or to fall into the residue; and yet on the death of both Richard and Mary under 21 without issue, did intend the whole fund should fall into the residue. I cannot, however, see it in that light. Richard dying under 21, his representatives might be his mother and sister, or perhaps his sister alone, and the testator might well have been contented to let his share take the ordinary course of distribution, though on the death of both brother and sister, without issue and under age, the whole fund was considered of importance enough on the demise of all the main objects of his bounty, to be secured to the residuary estate. However this may be, and after all, it is venturing unwisely into the uncertain region of conjecture, I am reminded by a writer of eminence, that the rule " that estates vested are not to be divested, unless all the events upon which the property is given over happen, seems to have been generally adhered

to, although an absurd and whimsical intention be thereby imputed to the testator." (*Powell on Devises*, 2, 232; *Graves* vs. *Bainbrigge*, 1 *Vesey*, 562.)

The result of this reasoning, therefore, is both against the claim of Mary Ringold by an implied survivorship, and that of the residuary legatees, on the ground the contingency has happened upon which they are to take; and I cannot but hold that the legacy of $2000, being vested in Richard, passed on his decease to his personal representatives, subject to the single condition upon which it may still be defeated, the death of his sister under 21, without issue. Mary will not be of age until May 15, 1851, at which time, if she be then living, she will be entitled to receive her moiety, and the representatives of her deceased brother to receive his. Should she die before that period, leaving issue, her issue will take her share; and should she die before that time without issue, the whole $4000 will fall into the residuary fund. The decree to be entered on this final accounting, should settle definitely the disposition of the legacy under every contingency, as above stated.

There is another question, arising upon a single item of the account presented for settlement by the executors, which it is necessary to dispose of. It appears that the testator Weyman, and A. and B. F. Smith, owned adjoining lots in this city, and Weyman being about to build on his lot, an agreement under seal was made in regard to a party wall. This instrument is a grant by the Smiths, of the use of six inches of their land, for the purpose of building a party wall, the same to be "a party wall between the parties, so long as the same or the greater part thereof shall stand." It also contains covenants for payment to Weyman, "his executors, administrators, *or assigns*," of the one half of the *value* of the wall, whenever a house should be erected on the Smiths' lot, the value to be appraised *at the time of use ;* provides that neither party shall excavate the ground below the founda-

tion of the wall ; that the wall shall be maintained in good repair at the joint expense of both parties, " their heirs and *assigns ;*" and finally closes by an express provision that, " *these covenants shall bind the lands covered or to be covered by said party and division wall, and the successive owners thereof, for the time being respectively, as to any thing done or to be done during their respective ownership.*"

The testator built the wall, and afterwards conveyed his house and lot, and the appurtenances, with all his right, title and interest, claim and demand, in law or equity, thereto, to his daughter Isabella Walker, " *subject to the covenants*" contained in the party wall agreement.   Subsequent to this conveyance, the assignee of the Smiths built on their lot, used the party wall, and paid the value of one half thereof to the executors of Weyman.   The question is, whether the covenant to pay one half the value at the time of use, enured to the benefit of the executors, or passed to Mrs. Walker, as a covenant running with the land to the assignee.

A covenant is said to run with land, when the benefit or the burden of it passes to the assignee of the land.

I. There has been much learned discussion, whether a covenant made by the owner of land, binds the land so as to *burden* the assignee thereof with its performance. The subject is elaborately examined in Smith's Leading Cases (*Law Lib. N. S., vol.* 27, *p.* 82).   By Common Law and the provisions of the statute (32 *H.* 8, *cap.* 34), both the benefit and the burden of covenants, which touch and concern the thing demised, run both with the reversion, on the one side, and with the land on the other, from assignee to assignee, in all cases where the relation of landlord and tenant exists.   But covenants made by the owner of land, where the relation of landlord and tenant does *not* exist, have been the subject of many nice and refined arguments. One objection to having such covenants hold the land, has been, that the assignee might often find himself liable to

contracts of which he was ignorant. Where the record acts prevail, this inconvenience would be obviated so far as the lien on the land is concerned, though the personal obligation growing out of a covenant running with the land, would not be discharged against the assignee, by a failure to record, or a want of notice. There seems to be no authority for holding that the burden of a covenant runs with the land against the assignee, except where the covenantor grants some estate in the same land, to which the covenant may be incident. (*Coke* vs. *The Earl of Arundel*, 1 *Eq. Ab.*, 26; *Keppell* vs. *Bailey*, 2 *Mylne & K.*, 517; *The Duke of Bedford* vs. *The Trustees of the British Museum*, 2 *Id.*, 552; *Collins* vs. *Plumb*, 16 *Vesey*, 454; *Rundall* vs. *Rigby*, 4 *M. & W.*, 130; *Milner* vs. *Branch*, 5 *M. & S.*, 417; *Brewster* vs. *Kitchin*, 1 *Ld. Raymond*, 317; *Taylor* vs. *Owen*, 2 *Blackford*, 301; *Plymouth* vs. *Carver*, 16 *Pick.*, 183; *Devisees of Van Rensselaer* vs. *Executors of Platner; Executors of Van Rensselaer* vs. *Executors of Platner*, 2 *Johnson's Cas.*, 24.) For the purpose of establishing a running covenant, there must always be a privity, and the land or estate, "is the medium which creates the privity." Where the covenant, therefore, accompanies the grant, where some estate or interest is granted, and yet some estate or interest in the same thing is reserved to the grantor, so that both parties have a common medium of privity, the burden of the covenant will run with the land to the assignee of the grantor. The principle upon which covenants have been held to charge the land in such cases is, that they are "in the nature of a grant, or at least a declaration going along with the grant, showing in what manner the thing granted should be taken." (*Brewster* vs. *Kitchin, Lord Raymond*, 318.) Thus in *Holmes* vs. *Buckley*, 1 *Abr. Eq.*, 27, there was a grant of a water course to J. H. and his heirs, by owners in fee, with a covenant by the grantors, their heirs and assigns, to cleanse the same. The assignee of the grantee, sued the assignee of the grantor for a breach, and the Court was of opinion, that it was a covenant which

ran with the land. In *Hills* vs. *Miller*, 3 *Paige*, 256, the grantor covenanted with the grantee, not to build upon a piece of land on the opposite side of the street and in front of the land sold, but that the same should be deemed public property for ever. This privilege of having the opposite lot kept open, was declared to be an easement annexed to the lands granted, attached to the estate and not to the person, and following that estate into the hands of the assignee thereof. So, on the other hand, it was also " *a charge upon the estate or property of the servient tenement, and followed it into the hands of any person to whom such tenement, or any part thereof, was subsequently conveyed.*" The same position was again laid down by Chancellor Walworth, in *The Trustees of Watertown* vs. *Cowen*, 4 *Paige*, 510, and upon the same ground, that the grantor had granted a right or easement out of lands not sold, for the benefit of the land which he had sold (*City of Cincinnati* vs. *The Lessee of White*, 6 *Peters' R.*, 431 ; 3 *Kent's Com.*, 433); and the easement granted was appurtenant to the property sold, and a burden on the land not sold ; so that whoever took the latter, took it with its burden, *quia transit terra cum onere.* Now, a grant of the use of land for the purpose of erecting a party wall, creates an interest of this kind. It is an interest in something annexed to the land ; and as common of pasture, estovers, or turbary, or a right of way, appurtenant to lands, it is an incorporeal hereditament, belonging to and passing with the land to which it is annexed. (*North Ipswich Factory* vs. *Batchelder*, 5 *New-Hamp. R.*, 192.) It was held in *Buckeridge* vs. *Ingram*, 2 *Vesey Jr.*, 663, that shares in a Company, possessing a mere right to navigate a river, were *realty.* This easement, said the Master of the Rolls, " is not the soil, but it is a right arising out of the soil—a right in and over the soil—a certain real right arising in and out of the soil." Such easements are in fact incorporeal hereditaments. That covenants will run with an incorporeal hereditament was decided in *Balby* vs. *Wells*, 3 *Wilson*,

26, where the lessee of tithes covenanted for himself and assigns, not to let any of the farmers in the parish have any part of the tithes, and it was held that the covenant ran with the tithes and bound the assignee. It was objected that tithes were incorporeal, and could not support a covenant against the assignee of a lease, but, said the Court, "if we can strip the mind of the idea of matter, there seems to be no difference between an inheritance in lands and an inheritance in tithes." So in the case of the *Earl of Portmore* vs. *Bunn*, 1 *Barn. & Cress.*, 694, there was a grant, for a term of years, of a license to continue open a water course. The reversioner brought an action of covenant against the assignee of the grantee, and all the Court were of opinion, that the easement was such an interest in lands, as would render the assignee of the grantee liable on a running covenant. The Courts of this State have undoubtedly gone further, in sustaining the negotiability of these running covenants, than has been done elsewhere. Thus in *Willard* vs. *Tillman*, 2 *Hill.*, 276; and *Demarest* vs. *Willard*, 8 *Cowen*, 206, it was held that the assignment of rent without the reversion, carried the covenant to pay, so that the assignee might sue in his own name; and in *Beddoe's Executors* vs. *Wadsworth*, 21 *Wendell*, 124, it was decided that a mere naked possession of land without any title, is a sufficient estate to pass a covenant to the assignee. It seems to me clear, therefore, that the grant of a party wall easement, conveys such an estate, as will bind the grantor who still retains the fee of the land, out of which the easement is granted. Were the question now before me, for decision, whether Smith's assignee was liable on the covenant to pay for one half the value of the party wall, I should be compelled to hold in the affirmative: that, having been bound in express terms by his grantor, he took his land with the burden, and should be held to the performance of the covenant which was attached to and ran with it.

II. But when we turn to the other side of the case,

and inquire who is entitled to the *benefit* of this covenant, we find that little, if any controversy, has ever existed in regard to the principles upon which the question is to be determined. Covenants for the benefit of the owner of the land to which they relate, and made with him, run to his grantee and each successive owner of the estate, and the assignee of the land is the person entitled to sue upon them (*Smith's Leading Cases, p.* 82); and it is a matter of indifference, whether the covenantor is a mere stranger, so long as the thing to be done relates to the land of the covenantee. There can be no doubt, therefore, in the present case, that if the whole tenor of the party wall agreement, was to create certain covenants running with the easement thereby granted, and designed to be appended to the adjoining lot for its benefit, that Mrs. Walker, the assignee of Weyman, may bring suit thereon, and recover for breach of the covenant. The instrument under the provisions of which this party wall was built, was an express grant of the use of six inches of the grantor's lot. This easement passed by Weyman's deed to Mrs. Walker as an appurtenance to his house. The term "appurtenance" passes every, thing, right, and privilege "not enumerated, but belonging to and used with the principal thing conveyed, and intended to be passed and enjoyed therewith." The word, strictly used, does not pass corporeal real property, but its appropriate subjects are incorporeal rights belonging to another principal, substantial thing. Mrs. Walker's deed not only conveyed to her Weyman's title to the party wall and the easement on the adjoining lot, but all his interest and claim therein, in law or equity. Unless, therefore, there be something in the nature of the covenant which interferes with its running with the land, I think, clearly, that the benefit of it enured to Weyman's grantee.

III. Was the covenant of such a nature as to run with the land? After granting the use of a strip of his land, the grantor covenanted with the grantee of the easement,

8

that in case the grantee should build thereon, he, the grantor, would pay one half the value of the wall, when he should thereafter use it. It is a covenant to pay for a building to be erected. Such a covenant, the building not being in *esse*, runs with the land only where "assigns" are expressly named. Such, however, is the case in the present covenant. In *Spencer's* case, which is the leading one as to what covenants run with the land, it was resolved that if the "lessee had covenanted for him *and his assigns*, that they would make a *new* wall upon some part of the thing demised, that forasmuch as it is to be done upon the land demised, it should bind the assignee; for although the covenant doth extend to a thing to be newly made, yet it is to be made upon the thing demised, and the assignee is to take the benefit of it, and therefore shall bind the assignee *by express words*." In *Grey* vs. *Cuthberston*, 2 *Chitty's R.*, 482, the lessor covenanted to pay the lessee, the appraised value of fruit-trees to be planted by the lessee, and to be on the demised premises at the expiration of the term. The lessor assigned, and action was brought against his assignee for the value of the trees, by the lessee, and it was held the lessor was not liable, because the covenant related to a thing not in *esse* at the time of the demise, and the lessor had *not* bound his *assigns* expressly in terms. The rule in *Spencer's* case was recognized, and it was admitted that if *the assigns* of the lessor had been named, they would have been liable. In *Bally* vs. *Wells*, 3 *Wilson*, 32, the same position is admitted to be good law; that a covenant by the lessee to build binds the assignee, if named. In *Sampson* vs. *Easterby*, 9 *B. & C.*, 505, there was a lease of a mine, and a covenant on the part of the lessee, to build a new smelting mill on waste lands which were not demised. An action by the assignee of the lessor was maintained, on the ground that the smelting mill, though not to be built on the land demised, tended to the support and maintenance of the thing demised, and the right of the lessor to use

the waste land for that purpose was appurtenant to his estate in the mines. This case is also in point to show that a covenant to build, where there is no other interest in the land than a mere easement, will run with the land to which the easement is appurtenant. In *Lametti* vs. *Anderson*, 6 *Cowen*, 302, the lessor covenanted to pay for such improvements as might be erected by the lessee, his executors, administrators, *or assigns*. The term appears to have passed by the ordinary form of assignment, and it was decided that a lessee making the improvements and assigning the term, the covenant ran with the land, and the assignee could recover. Again, in *Thompson* vs. *Rose*, 8 *Cowen*, 266, the lessor covenanted at the expiration of the term to pay the lessee the value of such buildings as he might erect; the lessee assigned all his title, both "in law and equity, in possession and expectancy," to the premises with the appurtenances. It was held, in conformity to *Spencer's* case, that the lessee's *assigns* not being expressly named, and the buildings not being in *esse* at the time of the demise, but *to be* erected, that the covenant did not run with the land. The Court, however, sustained the position that an assignment of the lease passed the equitable interest in the covenant to the assignee, who must sue, however, in the name of the lessee. This is certainly a strong case, showing that even where at law, by default of not naming the "assigns" of the covenantee, they cannot sue in their own name, yet, as in equity, by an assignment of the principal thing, an interest in the covenant also passed, they can, as in case of a chose in action assigned, sue at law in the name of the covenantee. These cases appear abundantly to establish, that a right to compensation for buildings to be erected passes to the assigns of the lessee, at law, if named; in equity, whether named or not. I cannot see how the case of a lease differs in principle from the present case. In the one there is a grant of a term, in the other, a grant of an easement; in both, the conveyance of a lesser interest

or estate, and the reservation of a fee. The lessee cove-
nants to build for his own use during the term, and for the
landlord's at the expiration of the demise, on being paid
the value. The grantee of the use of a strip of land for
the purpose of building a party wall, covenants to build
for his own use, and also for the grantor's whenever he
shall erect an adjoining tenement, on his paying half the
value of the party wall. The lessee builds and assigns
his lease, and at the expiration of the term, the assignee
receives the advantage of the money covenant. The
grantee of the party wall easement builds and assigns, and
when the grantor uses the wall, the assignee receives the
advantage of the money covenant. Here is a mutual
dedication, by way of grant, of a certain portion of the
land of each party, to uses common to the occupation and
enjoyment of each lot. On the land so granted and dedi-
cated, one agrees to build, and the other to pay him or his
assigns one half the value of the wall, when he shall use it.
He who has built, assigns his house and lot and all his
interest in the party wall, and why should not his assignee
recover on the covenant? The whole grant is to be taken
together, and will not be unnecessarily, broken into frag-
ments. When Weyman conveyed, it was an unbroken
covenant respecting the land, and something to be done
concerning it; and the covenant not only related to so
much of the wall as was built on the lot of either owner,
but each had an interest in the whole wall and the land
it covered. Can there be any doubt that the covenant,
not to undermine the party wall, relating as it does to the
security and protection of its subject matter, runs with
each lot to all the subsequent owners thereof? And so
likewise with the covenant to repair. An assignee of a
lease is bound by a covenant to repair (5 *Rep.*, 24); why
not an assignee of a party wall, the use of which is appur-
tenant to two adjoining lots. There is a privity of estate,
through the medium of the easement which is the subject
of the covenant. In fact, the parties have made them-

selves tenants in common of the entire wall. In *Matts* vs. *Hawkins*, 5 *Taunton*, 20, it was admitted by the Court, that a grant would have created such a tenancy. "There must be a conveyance," said *Heath, J.; and Chambre, J.*, "there is no transfer of property here, and the parties are severally owners of their respective lands as before." In *Cubitt* vs. *Porter*, 8 *B. & C.*, 257, however, it was held, that the common·use of a party wall was *prima facie* evidence that the wall, "*and the land on which it stands*," belongs to the owners of the adjoining lands in equal moieties as *tenants in common*. The same point was substantially recognized in *Campbell* vs. *Mesier*, 4 *John's Ch. R.*, 337. On looking at the agreement or mutual grant, between Weyman and the Smiths, there was such a conveyance, as gave each party an interest in the entire wall and the land on which it stood; which interest or estate was for the benefit of, and made appurtenant to their respective lots. Again, when Weyman conveyed, he assigned all his title in the subject matter of his conveyance, the lot and its appurtenances, that is, the lot and the entire interest in the whole wall and the ground upon which it was erected, which he then possessed as appurtenant to his lot. On his conveyance, the entire right of property, all the title he possessed in the wall, passed to his assignee. If this be denied, then it must be maintained that Mrs. Walker only took so much of the wall as stood on her lot, without any right in the appurtenant easement, which of course cannot be. If, then, Weyman on conveying, passed all his title to the entire wall, the right to use the wall could be required of its owner the assignee, only upon the terms of the covenant, payment of its value to Weyman or his assigns; and Weyman having parted with his equitable interest, he would, under the authority of *Thompson* vs. *Rose*, 8 *Cowen*, 266, be restrained from receiving the value of it, even if the covenant did not run with the land, except for the benefit of the assignee. In the case now before me, at the time this wall was used by Smith's assignee, it was not the pro-

perty of Weyman, but belonged to his assignee, subject to a covenant to let another person use it, on paying one-half its value to Weyman or his assigns. This covenant, which was made at the same time the use of the land was granted, related directly to something to be done upon it, and was one of the main ingredients of the value of the grant; the object of the grant being, to obtain the use of land and compensation for the wall to be erected on it. In *Vyvyan* vs. *Arthur*, 1 *Barn. & Cress.*, 410, the lessee covenanted to grind all the corn grown on the demised premises, at the mill of the lessor. This covenant being beneficial to the reversion, while the reversioner owned the mill, it was held that the assignee might maintain an action on the covenant, though to be performed off the land. So the Supreme Court of this State, in *Norman* vs. *Wells*, 17 *Wend.*, 136, held, that the negotiable character of covenants, was not confined to those which respect some physical act upon the land. The Court illustrated it by reference to the covenants for quiet enjoyment, warranty, to discharge taxes, for further assurance, not to carry on a particular trade, &c., all of which run with the land. One of the tests of the assignable nature of such a covenant was, whether it was beneficial to the land, like a covenant of renewal; and accordingly it was held, that where the lessor of a mill site covenanted not to establish any other mill on the same stream, for sawing mahogany, and then demised another site on the same stream, without any restriction as to its use, the covenant ran with the land first demised, and also bound the land last demised; and the main ground upon which this decision was based was, that the covenant affected the value of the land demised in the deed containing the covenant. A covenant to pay for one-half of a party wall to be erected, materially affects the value of the land, the use of which is granted for that purpose: certainly quite as much as a covenant to pay a lessee the value of buildings to be erected on demised premises, at the expiration of the term.

I have thus far treated this case, as if the parties to the party wall agreement, had refrained from making any express stipulation in relation to the force of the covenants they mutually entered into. But it should not be overlooked, especially in connection with the view that this agreement operated as a grant, that the instrument in terms provides at its close, that "these covenants," which means *all* "these covenants," "shall bind the lands covered or to be covered by said party and division wall." This certainly, by way of grant, imposed the obligation of all the covenants upon the land. But the provision goes further, in directing that the covenants shall also bind "the successive owners for the time being, respectively, as to any thing done or to be done, during their respective ownership." Independently of this clause, I have no doubt the covenant to pay for the use of the party wall, ran with the land to Weyman's grantee; and this clause seems to me, in fact, no more than a declaration of the law on that point. By those, however, who may not regard the question in this light, it must be admitted, the parties have here laid down a law for themselves, by which the obligation of the covenant is declared to bind, and the benefit of it to enure to, the successive owners of the property, as to *any thing* to be done during their successive ownership.

My opinion, therefore is, that the value of one-half the party wall, was improperly received by the executors. It should have been paid to Mrs. Walker, the grantee of the testator. The amount of that payment must, accordingly, be stricken out of the account.