## CLARK *against* BAIRD.

|     |     |
| --- | --- |
| 9   | 183 |
| 128 | 465 |
| 128 | 479 |
| 9   | 183 |
| 166 | 546 |

The opinions of witnesses acquainted with real estate, the value of which is in dispute, are competent upon the question of such value.

An action on the case may be maintained by the purchaser of lands against the seller for fraudulently misrepresenting the boundaries of the lands.

In such action the intent to defraud need not be established by direct proof, but may be made out by circumstantial or presumptive evidence.

A vendor of real estate is guilty of fraud if, knowing that he has no title to a portion of the lands sold, he wilfully suppresses that fact from the purchaser.

Where lands are described in a deed by certain known monuments, such description must prevail; and an understanding between the parties that the lands shall be bounded by certain other monuments, cannot control the terms of the deed.

Clark *against* Baird.

Where a grantor at the time of the execution of a deed put the purchaser in possession, and pointed out the boundaries, but the boundaries so pointed out embraced lands not included in the deed, occupation with the consent of the grantor for a less period than required by statute to bar a right of entry was held to give the purchaser no title to the lands not covered by the deed.

Twenty-five years' occupancy is required to bar a right of entry, where the adverse possession commenced prior to the adoption of the Revised Statutes.

ACTION on the case by the purchaser against the seller of a tavern stand in the town of Oxford, Chenango county, for fraud in misrepresenting the boundaries of the land. The cause was first tried before Mr. Justice MOREHOUSE, at the Chenango circuit, in August, 1848, and a verdict rendered for the plaintiff. A new trial was granted by the court at general term (7 *Barb.*, 64), and was had before Mr. Justice SHANKLAND in December, 1850.

The fraud alleged was in representing that the premises in question were bounded on the southerly or southwesterly side by a certain mill race, and that a certain buttonwood tree was in the southern boundary line of the lot. The material facts in the case, and the exceptions taken upon the trial, are sufficiently stated in the opinion of the court. The plaintiff again recovered a verdict, and on a new trial being refused at general term, the defendant appealed to this court.

*N. Hill, Jr.*, for the appellant, cited the following authorities:

As to the admission of the opinion of the witness with regard to the damages: *Harger* v. *Edmonds* (4 *Barb.*, 258); *Best on Presumptions* (*Law Library*), 384; *Sedgwick on Damages* (2d ed.), 589. As to the charge of the judge, that fraud might be established by circumstantial or presumptive evidence: *Flening* v. *Slocum* (18 *John.*, 403, *per* SPENCER, J.); 1 *Story's Eq.*, § 190; *Best on Presumptions*, 69. To show that continued possession by the boundaries not men-

tioned in the deed, with the acquiescence of the grantor and his successors in title, for less than twenty-five years, had ripened into a right of possession which tolled an entry : *Jackson* v. *Wheat* (18 *John.*, 44) ; *Smith* v. *Lorillard* (10 *John.*, 356, per KENT, *Ch. J.*) ; *Smith* v. *Burtis* (9 *John.*, 180) ; *Jackson* v. *Ellis* (13 *John.*, 120) ; 2 *Caines*, 183 ; *Wendell* v. *Van Rennselaer* (1 *John. Ch. R.*, 344) ; *Storrs* v. *Barker* (6 *John. Ch. R.*, 166), ; *Town* v. *Needham* (3 *Paige*, 545).

*R. Balcom* for the respondent,

As to the admission of opinions on the question of value and damages, referred to the following : *Morehouse* v. *Mathews* (2 *Comst.*, 514) ; *Brill* v. *Flagler* (23 *Wend.*, 354) ; *Joy* v. *Hopkins* (5 *Denio*, 84). As to the charge of the judge on the subject of the evidence of fraud : 18 *Wend.*, 375 ; 3 *Wend.*, 626 ; 1 *Hill*, 316 ; 1 *Denio*, 574, 577 ; 7 *Cow.*, 301 ; 4 *Wend.*, 300. That the monuments described in the deed control other monuments pointed out : *Cameron* v. *Irwin* (5 *Hill*, 272). As to the adverse possession claimed by defendant : *McCormick* v. *Barnum* (10 *Wend.*, 104) ; *Cole* v. *Irvine* (6 *Hill*, 634, ; *Willson* v. *Betts* (4 *Denio*, 201) ; 9 *Wend.*, 516, 518 ; 5 *Cow.*, 350, 351.

JOHNSON, J., delivered the opinion of the court.

The first question arising in this case is upon an exception to evidence. Nehemiah Smith testified for the plaintiff, that he had examined the tavern stand with a view of buying it. " It was worth $1000, if it extended to the race and trees. The strip taken off would reduce it one-fourth." This testimony was objected to, on the ground that the amount of damage cannot be ascertained by the opinion of the witness. The objection was overruled and the defendant excepted.

One of the alleged fraudulent representations which formed the subject of the action was, that the tavern stand extended to the race and trees, the plaintiff claiming that it did not in fact extend so far. The witness has in substance stated the value of the stand, including all the land it was represented to include, and also in contrast with that statement, and as bearing upon the question of damages, has further stated the value of the stand excluding that part which, as the plaintiff contended, did not pass by the defendant's conveyance to the plaintiff, by reason of his want of title. The objection does not point to any special incompetency in the witness, as for instance that he did not appear to have a sufficient acquaintance with the property to speak understandingly as to its value, but is put upon the broad ground that a witness cannot speak directly upon the question of the money value of property. The evidence was pointed solely to the question of damages, and the objection was undoubtedly understood by the court to relate to the competency of opinion upon the question of value. In *Morehouse* v. *Mathews* (2 *Comst.*, 514), a witness was asked, as this court construed the question, "How much in your opinion was the damage sustained by the plaintiff in consequence of feeding the cattle the poor hay instead of that agreed upon?" This was asked of the same witness who proved that hay of an inferior quality had been used. The court held the question inadmissible, as calling upon the witness for an opinion which it was the province of the jury to form. In *Harger* v. *Edmonds* (4 *Barb.*, 258), the witness had been asked in a great variety of forms as to the value to the defendant's tavern of a supply of water to his premises from an aqueduct, by the day, the quarter and the year, and as to the damage to the defendant by being deprived of it per day, quarter and year, and the questions were rejected. GRIDLEY, J., gave the opinion of the court, sustaining the decisions below and holding that the facts relating to the situation of the tavern, its business, the

Clark *against* Baird.

opportunity of procuring a supply of water from a different source, and the like, would have been the proper evidence to submit to the jury, and that the opinion of the witness was not competent. The force of the case as an authority is however very much weakened by the statement at the close of the opinion, that some of the questions which were rejected were on the border line which separates competent from incompetent testimony, and might perhaps have been allowed without the infringement of any important principle; and that some of the questions would have been scrutinized more closely if the court (on error) had not been of opinion that the kind and range of testimony admitted by the court below had been fully adequate to insure the defendant a full measure of justice. In *Joy* v. *Hopkins* (5 *Denio*, 84), an action on a warranty that a cow was good and young, after proof of the cause of action, a witness who had seen the cow was asked what she would have been worth if good and young; and also, what she would have been worth provided she gave four quarts of milk a day. On error the supreme court held that the questions were proper. McKissock, J., gave the opinion, holding that the rule that a witness must state facts and not opinions did not apply to cases like that before the court, and refers to *Lincoln* v. *Sar. R. R. Co.* (23 *Wend.*, 433), *Norman* v. *Wells* (17 *Wend.*, 136), and *McKee* v. *Nelson* (4 *Cow.*, 355). In *Paige* v. *Hazard* (5 *Hill*, 603), a witness was asked, as to a sunken boat, "From the description of the situation of the boat in question, as given by the witnesses, what would the damages be?" The court held the question improper. Cowen, J., in the opinion, after referring to *Norman* v. *Wells*, says: "The witnesses who were allowed in that case to give their opinions as to the amount of damages were not claimed to be experts; but the general ground was taken, that on this head witnesses are to give particulars, on which the jury are to compute the allowance. Surely nothing is more easy than to show the bill of expense in raising and

repairing a canal boat, if the injured party will take the least pains." In *Dunham* v. *Simmons* (3 *Hill*, 609), an action for damages for injuring a hired horse by over riding, after proof of the fact, a witness for the plaintiff described the condition of the horse after the injury, and was then asked what amount of damage had been sustained in consequence of the ill usage? The court, COWEN, J., held the question to be improper, as asking opinion on the amount of damages, but that ground not having been taken in the objection made at the trial, it was regarded as waived. In *Brill* v *Flagler* (23 *Wend.*, 354), the action was for damages for killing a dog, which appeared on the trial to be a setter, and was claimed to be valuable for hunting birds. After some evidence tending to show the good qualities of the dog as a setter, a witness was asked as to the value of a good, well broke setter dog, and the value of the services of breaking a setter dog. The witness testified as to the value of setter dogs generally and not as to the dog in question. The question was excepted to, and upon error the supreme court granted a new trial upon other questions involved in the case. As to the question above stated, NELSON, Ch. J. (with whom COWEN, J., concurred), said: "The opinions allowed as to the value of a well broke setter dog, I am inclined to think, were barely competent, and the answers of the witnesses depended in a measure upon their skill and judgment in respect to these animals. The questions were put to persons supposed to be acquainted with the peculiar qualities of setter dogs, and who had some knowledge of their value in market. The case is analogous to those in which the opinions of persons are always admitted of the value of domestic animals, such as cattle, sheep, &c., in which they are in the habit of dealing. They are supposed to be better acquainted with the general market value of such animals than the generality of mankind. A common standard is thus fixed that may assist in arriving at the value in the particular instance, which will vary according to the

quality, condition, &c., of the article in question." BRON-
SON, J., was of opinion that improper evidence had been
given on the question of damages, referring in all proba-
bility to that upon which the chief justice had commented.

In *Norman* v. *Wells* (17 *Wend.*, 136), an action of cove-
nant for damages to plaintiff by the erection of another
mill on the same stream with plaintiff's mill, a witness
(who had been a workman in plaintiff's mill) was asked the
damages which in his opinion plaintiff had sustained, and
the question had been allowed to be put at the trial.
The supreme court on that ground granted a new trial.
COWEN, J., in the opinion of the court, considered the
question at length. After pointing out the numerous and
complicated inquiries upon the correct answer to which a
just estimate of the damages would necessarily depend,
he says: "The ordinary, and in general the only legal
course is to lay such facts before the jury as have a bearing
on the question of damages, and leave them to fix the
amount. They are the only proper judges. They are
impartial, and capable of entering into these ordinary
matters." After adverting to the principles upon which
opinion is allowed to be evidence on matters of science, he
proceeds: "Surely there can be nothing like science in
ascertaining the loss of this plaintiff from a rival factory.
After hearing particulars, one man can reckon up the amount
as well as another, though none with perfect accuracy.
That is no reason for receiving opinion, but a very powerful
argument against it. The amount of indemnity, where it
is not capable of being reached by computation, is always
a question for the jury. If there be any rule without
exception, it is this; and I have been unable to find any
instance where the opinion of witnesses has been received."

In *Lamoure* v. *Caryl* (4 *Denio*, 370), on error to the common
pleas, it appeared that on the trial, to sustain a set-off for
services as clerk of the plaintiff by the defendant, a witness
who had known the defendant as a clerk while in the

plaintiff's service, was asked by defendant what his services were worth. The witness had before stated that he was a farmer and did not know what clerks in country stores usually received. The supreme court held that the allowance of the question to be put was erroneous. BEARDSLEY, J., gave the opinion. "In general the opinion of a witness is not evidence for a jury, although there are exceptions to the rule. But they all proceed on the principle that the question is one of skill or science, or has reference to some subject upon which the jury are not supposed to have the same degree of knowledge with the witness. The evidence of experts is received on the ground of science or skill; and witnesses may speak on the value of property or labor where it appears they have peculiar sources of knowledge to guide them on these subjects, and which are not presumed to be equally within reach of the jury. The parties were entitled to the judgment of the jury on the value of the defendant's services, and how were they rightfully to be aided by the mere opinion of a witness who had no means of information beyond their own? Opinions are to be formed by jurors; but it is the business of witnesses to deal with facts." In *Lincoln* v. *The Saratoga R. R. Co.* (23 *Wend.*, 425), the circuit judge had allowed witnesses who testified that they were well acquainted with the nature and extent of the plaintiff's business to state their opinions as to the amount of damage which he must have sustained in that respect in consequence of his inability to attend to it, occasioned by the injury on account of which the action was brought. In his charge the judge stated that where a party is engaged in commercial business on an extensive scale, the extent of the injury to his business was not susceptible of direct proof, and that the opinions of intelligent men residing in his neighborhood, engaged in similar pursuits and intimately acquainted with his business, when satisfactory reasons were given for such opinions, were entitled to great weight, but were not absolutely

binding upon them. NELSON, Ch. J., delivered the opinion of the supreme court granting a new trial, and after stating the general rule that witnesses are to speak to facts, he says : " Opinions, belief, deductions from facts, and such like, are matters which belong to the jury; when the examination extends to these, and the judgment, belief and inferences of a witness are inquired into as matters proper for the consideration of a jury, their province is in a measure usurped; the judgment of witnesses is substituted for that of the jury. To this settled principle, which is and should be steadily and rigidly adhered to, exceptions have been made, and the material question before us is whether the opinions admitted in this case fall within any of them." After stating the general exception of questions of science and instancing the opinions of engineers, of ship-builders as to seaworthiness, of medical men as to sanity and as to causes of disease and death, of persons engaged in particular departments of business, called to speak upon subjects connected therewith, where their experience and observation enable them to speak with more understanding than others, he adds : " Upon the like ground, it is every day's practice to take the opinion of witnesses as to the value of property — persons who are supposed to be conversant with the particular article in question and of its value in the market; as a farmer, or dealer in or person conversant with the article, as to the value of lands, cattle, horses, produce, &c. These cases all stand upon the general ground of peculiar skill and judgment in the matters about which opinions are sought." Applying these principles to the case then before the court, he concludes that though merchants situated as the witnesses were might make a tolerable conjecture as to the amount of damages, yet their conjectures were not proper to be submitted to a jury. That the facts on which their opinions were founded could be submitted to the jury, and

they were to give them such weight in estimating the damages as they should deem them entitled to.

The foregoing are substantially the decisions in this state upon the question presented. In New Hampshire, it seems to be the settled rule that witnesses cannot be asked their opinions as to the value of property, even when they are well acquainted with the particular property, and have examined it for the purpose of ascertaining its value, and with a view to purchase. The question was carefully considered in *Rochester* v. *Chester* (3 *N. Hamp.*, 349, 364), which related to the value of land. In *Peterborough* v. *Jaffrey* (6 *N. Hamp.*, 462), the witness was offered as a man of skill in the matter of buying and selling lands in the vicinity of those in question. The court say: " There could be no circumstance which could fix the particular marketable value of the land, which was a matter of peculiar skill and knowledge of the witness. The ordinary value of land of a particular description within the county must be a matter of public notoriety, and is such a question as the jury, who are by statute required to be freeholders, would be fully conversant with and abundantly able to decide." In *Whipple* v. *Walpole* (10 *N. Hamp.*, 130), while the court acknowledge the existence of the rule as laid down in the two cases last cited, they seem somewhat pressed with its inconvenience in practice, saying, "It certainly would facilitate our inquiries in many cases to ask directly as to the value of property; while in other cases the testimony of witnesses might so conflict as to aid the jury but little in their investigations." In that case the question asked related to the market value of property at a particular time and place, and that was held to be matter of fact and not of opinion. In *Beard* v. *Kirk* (11 *N. Hamp.*, 397), which was trover for a sled, a witness deposed that he had been seven years engaged in teaming, had owned, bought and sold many sleds, was acquainted with their value, and that when he last saw the sled in question he should think it worth from

fifteen to twenty dollars. The deposition was rejected. The court sustained the ruling. PARKER, Ch. J., says: "He was not a manufacturer of sleds, if that might be supposed to indicate skill, nor was he otherwise possessed of any particular science or skill respecting their construction or use. The fact that he had used sleds more than people in general, and had bought and sold many, might serve to show that he had more knowledge respecting the best form and size, and respecting the price at which they could be purchased or sold, than many others; but this is not sufficient to give him the character of an expert. If it was so, the fact that any person was more familiar with the use and price of any articles than other members of the community generally were, would give him the character of an expert in relation to articles of that description and admit his opinion in evidence. If there had been such a thing as a market value of sleds at the place, the witness's knowledge respecting sales might have enabled him to testify to the market value of such a sled, which would involve matter of opinion to some extent in making the comparison, but the evidence would be admissible taken together as a matter of fact."

In Maine (*Tebbetts* v. *Haskins*, 16 *Maine*, 288), master builders were admitted to testify as to their opinion and estimate of the probable expense which had been incurred in building a house, in a suit for the value of the materials and labor employed in building it, upon the ground that the opinions of persons skilled in particular branches of trade or manufacture should be received as well to the value as to the fidelity and excellence of the work.

In *Kellogg* v. *Krauser* (14 *Serg. & Raw.*, 142), the supreme court of Pennsylvania held that a witness might be asked directly as to the money value of land. They say: "The principal reason assigned by the plaintiff against this evidence was, that an opinion of the value of land is not evidence because it is not a fact. It is certain that such

opinions are every day received as evidence, although it is true that an opinion is not strictly a fact; and it is difficult to conceive how the value of land can b'e proved without them. The witness may indeed prove the prices at which other lands in the neighborhood were sold, but that would not ascertain the value of the land in question without a comparison between it and the land which was sold as to quality; and quality is very much matter of opinion. It is a kind of evidence so commonly admitted without dispute or objection that I have no doubt of its legality."

In *Vandine* v. *Burpee* (13 *Metc.*, 288), the supreme court of Massachusetts held that a witness, an experienced gardener, who had examined the plaintiff's garden and nursery after it was injured by the burning of the defendant's brick-kiln, and who had detailed the condition of the garden, plants, &c., might be asked as to the amount of damage inflicted by the injury of which he had testified. DEWEY, J., gave the opinion, and after stating the general rule and referring to the New Hampshire and other cases, says: "It seems to us that it would be impracticable to dispense with this species of testimony, in many actions of trover for personal property where no detail of facts could adequately inform the jury of the value of the articles. The opinion of a witness as to the value of a horse is much more satisfactory evidence than a detailed statement of his size, color, age, &c., to give the jury the requisite information to enable them to assess damages for the conversion of such a horse."

The grounds upon which opinions involving scientific knowledge are received in evidence are well shown in *Norman* v. *Wells*, and *Lincoln* v. *Saratoga R. R. Co.*, and also in the opinion of Senator Verplanck in *Mayor, &c., of New-York* v. *Pentz* (24 *Wend.*, 673), to rest upon a natural foundation. The very notion of science springs from the recognition of the existence of general truths and laws, to which the relations of things to and their operation upon each other conform. These laws or truths, ascertained by

Clark *against* Baird.

the investigations of men devoted to particular departments of inquiry, constitute science. In different branches of knowledge, different degrees of certainty are attainable. In mathematics, for instance, exact certainty is attained, while in medicine we are compelled, from the nature of the subject, to rest satisfied with a less degree of certainty. In every case the scientific witness brings the result of the previous investigation of general truths or laws to aid the particular inquiry. In case of death, the physician, from an examination of the body or from the appearance of its parts as proved by witnesses, speaks as to the cause of death, as that it was produced by poison or by disease. In such a case the substance of his testimony is that those appearances, seen by himself in the body or proved to exist there either generally or universally, have been observed to accompany death produced by such poison or disease. It is the general or universal fact which science supplies to him, and which through him is made available to the jury. And moreover, as the application no less than the original recognition of these matters of scientific knowledge requires trained habits of observation, and that skill which does not exist without experience, the scientific witness is allowed to form a complex judgment upon the matter in hand, embracing both the general truths of his science and their particular application to the facts presented to him, which takes the shape of opinion or judgment that in the particular case death did or did not result from such a poison or such a disease. In all these cases of inquiry as to scientific opinion, without exception I believe, the witness need know nothing, of his own knowledge, as to the facts of the particular case. His opinion may be given as to hypothetical cases, or upon any view of the facts in evidence as established or supposed to be established by other witnesses, though of course so given its weight may be much less than where he can speak both to the particular facts and to the proper scientific interpretation of them.

Evidence of opinion is also recognized as proper on the same ground of necessity in cases where language is not adapted to convey those circumstances on which the judgment must be formed. In questions of identity of persons or things, language is wholly incapable to convey the appearances and sensible marks on which alone an intelligent judgment can be formed. So too in respect to handwriting, who would undertake to describe in words the ground upon which he recognizes his own, with any expectation by that means of enabling another person to pronounce upon its genuineness? In these cases the opinion of the witness is received because there are no other means of investigation adapted to the inquiry. (24 *Wend.*, 675.) Opinions as to the value of a specific thing expressed by a witness acquainted with that thing stand much upon the same principle. To take the case put in *Vandine* v. *Burpee*, above cited, as to the value of a horse, a whole volume of descriptive testimony about the horse would be not so likely to guide a jury to a true estimate of his value as the testimony of a single witness, acquainted with the animal and speaking his judgment as to the value. Upon this ground, as well as upon that of superior convenience and the constant reception of such testimony upon trials without objection, a tacit but strong proof of its propriety, it must be deemed established that, upon a question of value, the opinion of a witness who has seen the thing in question and is acquainted with the value of similar things is not incompetent to be submitted to a jury.

The first four propositions charged by the judge were not, I think, subject to objection on the part of the defendant; especially when taken in connection with what he said upon the defendant's thirteenth proposition. They were, taken together, in substance and in terms: That the action could not be sustained without positive fraud. That there must be no doubt whatever; that it must be perfectly clear, and that it must not be decided on a nice calculation

nor on a balance of evidence. That, though fraud must be proved, direct proof was not necessary, but that circumstantial or presumptive evidence might be resorted to. That the intent to defraud need not be established by direct proof; and that, when the intention with which an act is done is to be ascertained, it may be inferred or presumed from the knowledge of other facts. That if the jury believed from the evidence that the defendant represented to the plaintiff that he owned the land to the race and buttonwood tree, and sold it to him, when he knew he did not own to such monument and boundary, the defendant was guilty of fraud, if the plaintiff purchased believing such representations to be true. That if the defendant knew at the time of the sale that he had no title to a portion of the land he sold to the plaintiff, and wilfully suppressed that fact from the plaintiff, the defendant was guilty of fraud.

The authorities to which we are cited by the defendant on these matters hold the doctrine, which I take it will hardly at this day be questioned anywhere, that fraud is never to be presumed, but must always be proved; but they do not undertake to maintain that fraud cannot be proved by circumstantial evidence, which is in substance the judge's charge in this case.

I see no other ground upon which this part of the charge could be reasonably objected to, except upon the ground that an action will not lie against the vendor of real estate for a false and fraudulent representation respecting the fact of title. Upon that question, if it is not, technically speaking, determined by the decision of this court in *Whitney* v. *Allaire* (1 *Comst.*, 305), I think the opinion of the majority of the court is entirely satisfactory. The material inquiry is as to the fraud and damage, and not as to the particular species of property as to which it has been perpetrated.

The next proposition charged, as to which there is an exception, was that the monuments mentioned in the deed

from Stratton to Adams cannot be varied or controlled by any pointed out to Adams previous to his taking the deed from Stratton. This the judge charged, adding, " that the same depended on the circumstances stated in the cases." I do not precisely understand the force of this modification, and cannot presume that it was more unfavorable to the defendant than the original proposition. This instruction related to the question of title, not of fraud, as appears plainly enough from its terms. The same remark applies to the next proposition excepted to : that known monuments described in deeds control other monuments pointed out on actual location, if those in the deed cannot be reconciled with those pointed out.

The title was material in this action. That the plaintiff did not get title was a part of his case. It was therefore necessary for the judge to give these instructions, which I do not understand to be complained of, so far as the question of title is concerned. If the judge had told the jury that in determining upon the question of fraudulent intent they were not at liberty to consider any evidence as to other monuments or boundaries pointed out by Stratton, and possession according to them, I should have been inclined to think it erroneous. But it should, if the fact was so, have been made to appear by the bill of exceptions.

The next exception to which the defendant has called our attention is to the charge of the judge, " that if the defendant was persuaded in his own mind that the representations as to the boundary were contrary to the fact, it was his duty to disclose such suspicions." The expression, persuaded in his own mind, is equivalent to satisfied, convinced, and does not indicate a state of doubt or conjecture. So understood, and so it must be understood, for the expression is a strong one to indicate the contrary of doubt or suspicion, it needs no argument to show that a man is not at liberty to represent the contrary of that of which he is

Clark *against* Baird.

persuaded in his own mind, by way of inducement to another to contract with him.

As to the request of the defendant that the judge should charge "that the evidence of Delos Brown was of the most unsatisfactory kind, and failed to establish any wrong of the defendant," the judge disposed of it correctly by submitting its weight and pertinence to the jury.

Nor is there any ground to contend that the judge should have directed a verdict for the defendant, as was claimed by the last branch of the defendant's thirteenth request, unless we shall be of opinion as matter of law that the defendant had title to all the land which he undertook to convey. If that was not so, the necessity of submitting the evidence of fraud to the jury is apparent.

So also the judge was undoubtedly correct in charging that if it was the object of the defendant to suppress the truth and deceive the plaintiff as to the true boundary, when he said in presence of Delos Brown that the deed was laid aside or mislaid, and that assertion was false, then that the plaintiff's case was made out so far as the fraudulent intent was necessary to the action. The defendant by his argument seems to understand this as a statement by the judge that the whole of this proposition depended upon Brown's testimony, while the terms of the proposition itself show that his name is introduced only as pointing to the particular declaration of the defendant which Brown had sworn to, that the deed was then mislaid or laid aside.

The other points made on the argument by the defendant I shall consider together. The defendant requested the judge to charge that the location of the line, as proved by Smith, Adams, Beman and Sylvester M. Baird, and adopted by Stratton as well as by the Lewises, the grantees of Stratton, he being the common source of title, conclusively establishes that line to be the true one. The judge refused thus to charge and the defendant excepted. The judge also charged that possession was taken by the defendant up to

the mill-race, but as a matter of title the same did not extend to the mill-race, and the defendant excepted.

Prior to March, 1822, Stratton owned in fee a tract of land which included all the premises in question in this case. On March 18, 1822, he conveyed to John Adams a part of the land, describing it by courses and distances, and by metes and bounds. Adams by deed dated May 15, 1824, conveyed by the same description to Erastus Smith, who by deed dated April 13, 1825, conveyed to Luman McNeil, the deed omitting two of the lines in the deed to Adams. McNeil by deed dated February 25, 1829, conveyed to the defendant, the deed omitting one of the two lines omitted in the deed to McNeil. Each of the deeds speaks of the quantity of land as one acre, more or less. By deed dated August 5, 1837, John Stratton conveyed to Stephen and Clark Lewis a tract of land by courses and distances and monuments, which include the whole premises in question. The deed however contains the following clause: "reserving to the parties of the first part one-half acre of the above described land for the use of a burying-ground that is now used as such; and also about one acre of land deeded by them to John Adams and now owned by Samuel Baird."

According to the undisputed testimony of the surveyor, the courses and distances in the deed to Adams, commencing at the place of beginning mentioned in the deed, as to the true position of which there is no question, do not lead back to the highway, as the call of the deed requires, and the last line, which should according to the deed run to the place of beginning, terminates in the house. The stakes and stones mentioned in the deed were not found. The actual distance upon the highway from the place of beginning to the race is one chain, seventy-six links, or seven rods and one link. The length of line upon the highway according to the deed is one chain, twenty-five links, or five rods. The line according to the courses and distances of the deed runs two rods north of the buttonwood trees instead of by them.

Clark *against* Baird.

Although we have not the maps which were used upon the trial and referred to in the testimony of the witnesses, and therefore are not able with entire accuracy to determine the relative positions of the lines of the deed in reference to the actual line of the highway, and of the race and trees, still it sufficiently and plainly appears that by no construction which can be put upon the terms of the deeds can the premises described be made to extend to the race and buttonwood trees. From the time of the purchase by Adams, the tavern stand has been occupied first by Adams, then by Beman as his tenant and as tenant to Smith and McNeil, and then by the defendant Baird until his sale to the plaintiffs.

In respect to the location and possession of these parties, *Adams* testified that he was put in possession of the land from the Spoor line to the mill-race all around by Stratton. That Stratton pointed out the corner, which was sixteen or seventeen feet towards the race from the corner of the house. That a stake and stones stood there on the road for the corner, and that he remembered no other stake and stones. That he bought of Stratton a piece of land surrounded by the mill ditch (or race). That the land was surveyed before he received his deed; that he aided in part of the survey. That Stratton and the surveyor said they could not survey around by the race without considerable difficulty, and so the survey was made out not extending to the race.

*Beman* testified that Adams put him in possession up to the bank of the race and down the race to the buttonwood trees on the bank. That he conversed with Stratton about the line, and that Stratton described the boundaries just as he was put in possession. Stratton said the land on the north side of the race was sold to Adams and contained about an acre; that it came to the bank of the race, and he spoke of the buttonwood trees as on the line. When this conversation occurred they were on the land. While the witness occupied the premises there was no division fence along the

Clark *against* Baird.

race, and he occupied the land south of the race as tenant to Stratton all the time he occupied the tavern stand.

*Sylvester M. Baird* testified: That he was present at a conversation between his father (the defendant) and Stratton before the defendant took possession of the premises; defendant inquired as to the boundary of the tavern lot, saying he wished to build a fence from the road to the trees; that Stratton pointed out the line running from the street and on the bank of the ditch to the buttonwood trees; that the fence was built on the line as shown by Stratton from the road by the race to the trees; that when defendant took possession of the tavern stand he also went into possession as tenant of Stratton of the land on the south of the ditch; that one York (also a witness) never occupied north of the ditch.

*Henry C. Baird,* another son of defendant, testified: That he helped build the fence on the race; that he saw Stratton with defendant on the bank of the mill-race and conversed about the line below the trees; the fence above had been built; Stratton said the line ran with the race; he said the survey was on the bank and that the buttonwood trees were on the line; that the defendant afterwards built the fence below the trees on the bank of the creek to let the water come into the lot; that it was built on the line as shown by Stratton; that Stratton was there afterwards frequently and never objected to the fence, that witness heard of; that York sent a man to build his portion of the fence.

*Jeremiah York* testified: That he occupied the mill lot as purchaser from Stratton, and paid for it, and the deed was made to the Lewises; that he took possession in 1831 or 1832 and retained possession three or four years; that he occupied a strip of land between the race and the tavern; that Stratton put him in possession of it and that he occupied as his own under claim of title.

*Stephen Lewis,* one of the grantees of Stratton before mentioned, testified: That he and his brother occupied the mill lot at the time the defendant sold to the plaintiff; that

the fence was on the bank; that the wall built by plaintiff is three to four feet further south than the old fence on the bank of the ditch; that there was no controversy about the line until the plaintiff came there; that York did not put him in possession of any land north of the fence; that he never claimed any land north of the fence while Baird lived there; that the fence then ran on the bank; that from the corner of the house to the ditch is thirty-two feet; that he had since got possession of about one-quarter of an acre north of the ditch. There was some other testimony bearing upon these points; enough, however, has been stated for the present purpose.

It is manifest that Baird in 1840 had acquired no title by adverse possession, which certainly did not commence before Adams was put into possession by Stratton. Twenty-five years was the period necessary to maintain the title upon the ground of adverse possession. Looking to the paper title alone, it is beyond question that the southern boundary of the lot conveyed by Stratton to Adams did not extend to the mill-race. It remains then to consider the effect of the location of the land by the acts and declarations of Stratton made to the defendant and those under whom he derived title. At the time when Adams received his deed from Stratton the land had been surveyed, so as not to extend to the race, and the description inserted in his deed was taken from that survey. All this he knew, and received the deed in that form. Now, if Stratton had then in the strongest form of words which could be selected, declared that the intention of the parties was that his lot should extend to the race, it could not be of any avail. It would, if effectual, amount either to a conveyance of lands by parol, in case the declarations were subsequent to the deed, or else, if they were prior to or contemporary with its delivery, such a declaration of the intended effect of the language of the deed, if effectual, would violate the rule which forbids parol evidence to alter a written contract.

In *Clark* v. *Wethey* (19 *Wend.*, 320), the judge at the trial charged the jury that "if they were satisfied that the line of marked trees (lying beyond the premises included by following the terms of the deed) was made at the time of the survey and when the deed under which defendant claimed was executed; that such line was established by the parties at the time of the execution of the deed as the boundary between them; that possession was taken accordingly; that the plaintiff had acquiesced in that line as the boundary and the defendant and his ancestor had made improvements to that line, with the knowledge and acquiescence of the plaintiff, the defendant had made a good defence; but that no acquiescence short of actual knowledge at the time of the establishment of the line and assent thereto, would conclude the plaintiff; and that therefore unless they found that the line was so established by the defendant's ancestor and acquiesced in by the plaintiff, they must find for the plaintiff." The jury found for the defendant. The supreme court granted a new trial. COWEN, J., delivered the opinion of the court, taking notice of the decision of the court for the correction of errors, in *Adams* v. *Rockwell* (16 *Wend.*, 285), then recently decided, in which all the cases in this state to that time had been reviewed, and examining the whole doctrine as to the conveyance of lands by parol through the medium of a location of boundaries contrary to the terms of the deed, and came to the conclusion, in which I think his argument fully sustains him, that upon principle where the description in the deed designates a piece of land as that conveyed, the description cannot be departed from by parol evidence of intent or of acquiescence in another boundary, unless such an adverse possession be shown as is in itself a bar to an ejectment.

In the case before us, if the conveyances to Adams, Smith, McNeil and Baird had been expressed in the same general terms as are used to describe the premises in Baird's

deed to the plaintiffs, I am inclined to think that such evidence of assent on the part of Stratton and the Lewises might properly have gone to the jury, and that they would have been authorized to find that the premises conveyed did extend to the old fence near or on the bank of the race. But upon the conveyances as they were actually made we find that the description of the premises can be definitely applied to the land in accordance with the fixed legal principles which govern the construction of such instruments, and that so applied it cannot be made to include that part of the premises in respect to which this litigation has arisen. The court, therefore, committed no error in the portion of the charge complained of; there was no question to be submitted to the jury in respect to the claim that Baird's title extended beyond the boundaries in the deed from Stratton to Adams.

RUGGLES, Ch. J., and GARDINER, WILLARD and TAGGART, Js., concurred in the foregoing opinion.

DENIO, J., did not hear the argument.

MASON, J., gave no opinion.

MORSE, J., was absent.

Judgment affirmed.