## BENKARD *a.* BABCOCK.

*New York Superior Court; General Term, February,* 1864.

WAIVER OF APPEAL.—ACCEPTING PAYMENT OF JUDGMENT.— COUNTER-CLAIM.—LEASE WITH WARRANTY AGAINST PERCOLATION OF WATER. — OPINIONS OF WITNESSES.— MEASURE OF DAMAGES.

The receipt of the amount of a judgment, voluntarily paid, does not affect the right of the party receiving the payment to appeal from the judgment simply to obtain a judgment for more. The principle upon which a party enforcing a judgment is not allowed also to appeal from it, rests upon the injustice of enforcing or claiming that, the only right to which is derived from the judgment of a court, and repudiating that which is made the consideration therefor by by the same adjudication, considered as an entirety.

Where the defendant sets up a claim against the plaintiff as a set-off, with a prayer for judgment for the excess of his demand over the amount claimed by the plaintiffs, his rights as to such demand, as well as the pleadings and evidence in relation thereto, are to be governed by the same rules as if he were a plaintiff suing upon such claim.

Under a covenant in a lease that the sub-cellar of the premises should be "free from percolation of water through the walls," an answer in an action against the tenants for rent, that during a period, exceeding several quarters, the water had percolated through the walls, and rendered the premises unfit for use, is not a claim for damages during each quarter respectively, to be set off against the rent due at the end of that quarter, but a claim for general damages as being caused by one continuous occurrence.

In such a case it is proper to charge a jury that the defendants cannot claim for "any injury resulting from dampness not caused by percolation of water into the sub-cellar." Any necessary natural dampness incident to the location of the sub-cellar or its construction, and not effected at all by water getting through the walls or floor of the sub-cellar, is a consequence which the defendants themselves must bear.

In such an action it is error to allow inquiries to be put to witnesses as to the injury to the value of the premises in consequence of the dampness thereof, without laying a proper foundation for such inquiries by showing a breach of the covenant during the time referred to.

Testimony as to the injurious effect of moisture in such a case is not proper, without reference to the origin of the moisture; and the admission of such testimony is erroneous.

A witness who is shown to have hired stores, and is acquainted with their value, is not thereby shown to be an expert, and qualified to express an opinion as to the deteriorating effect of dampness in the cellar of the store, on its yearly value.

Such difference in yearly value is not a proper subject of proof by the opinions of witnesses.

Nor is it the proper measure of damages, where the lessees' interest in the term is not assignable.

Appeal from a judgment

This action was brought by James Benkard and Benjamin H. Hutton against Charles H. Babcock and others, to recover the rent which the latter had covenanted to pay in a lease of a store or warehouse in the city of New York.

By the lease the plaintiffs had covenanted that the sub-cellar of the premises should be free from percolation of water through the walls, &c. The defendants set up in their answer that this covenant had been broken, and claimed damages therefor in effect as a counter-claim.

The plaintiffs having recovered a verdict for a part of the amount they claimed, entered judgment, with costs, which the defendants voluntarily paid, and which was accepted by the plaintiffs, who nevertheless prosecuted this appeal from the judgment to gain a new trial for alleged errors at the first trial. The details of the facts sufficiently appear in the opinion of the court.

*Wm. Curtis Noyes*, for appellants.

*Augustus F. Smith*, for respondents.

BY THE COURT.[*]—ROBERTSON, Ch. J.—It is claimed by the defendants that the plaintiffs have waived their appeal in this case by accepting from them the amount of the verdict in favor of the latter, with costs. Numerous authorities have been cited to us on the argument to sustain that position, but they will all be found to be cases where an appellant had attempted actively to enforce either the whole of a judgment-order or decree in his favor, or else some part thereof, connected with and dependent upon such other part thereof as he may have appealed from; or else where he had availed himself of some benefit or favor granted or offered to him by such judgment-order or decree, as an alternative to exercising the right of appeal. Thus

[*] Present, ROBERTSON, C. J., GARVIN and McCUNN, JJ.

in one of the most recent cases, Bennett *a.* Van Syckel (13 *N. Y.*, 481), a defendant had appealed from all parts of a judgment, except such as ordered the plaintiff to execute a bond of indemnity to him against the covenants in a lease, which he was therein directed to assign to the plaintiff, and also to pay certain moneys into court to have the right thereto contested; notwithstanding which, he sued upon such bond of indemnity when delivered to him, and proceeded to litigate his right to such moneys; and it was held that the connection of all parts of such judgment with, and their mutual dependence upon each other, precluded the defendant from availing himself of such part of the judgment as was in his favor, and appealing from that which was prejudicial to him.

In Vail *a.* Remsen (7 *Paige*, 206), the more general principle was sanctioned, that proceeding upon an order appealed from by an appellant was a waiver of his appeal.

In Radway *a.* Graham (4 *Abbotts' Pr.*, 468), and Lewis *a.* Irving Ins. Co. (15 *Ib.*, 140), the acceptance of a benefit granted by an order in the shape of costs to an appellant, as a condition of a favor granted thereby to his adversary, was held to be a waiver of an appeal from the part of the order granting such last favor.

In Noble *a.* Prescott (4 *E. D. Smith*, 139), the mere renewal of a motion, according to a privilege to do so granted in an order denying such motion, was held to be a waiver of an appeal from the part of the order so denying it.

The decisions in all these cases are traceable to the same principle as that laid down in Bennett *a.* Van Syckel (*ubi sup.*), which is the injustice of enforcing or claiming that, the only right to which is derived from the judgment of the court, and repudiating that which is made the consideration therefor by the same adjudication, considered as an entirety.

The principle applied in those cases, therefore, does not conflict with that sustained in Higbie *a.* Westlake (14 *N. Y.*, 281), and Clowes *a.* Dickenson (8 *Cow.*, 328), which were decided in the court of last resort. That justified an appellant in receiving money voluntarily paid to him, although adjudged to be due to him by a judgment-order or decree from which he had appealed, simply to gain a decree for more. Whatever might be the result of the appeal, he could not be compelled

to restore moneys so voluntarily paid. It was only available as an extinguishment of his claim, or part of it, in any subsequent litigation, and formed no basis for an order of restitution. A tender and payment of money into court admits the cause of action, and gives to the party to whom it is tendered an absolute right to such sum for the same reason. The payment of a sum of money on account of a claim, even after judgment, does the same thing. The existence of the judgment is immaterial, and the pendency of the appeal only has the effect of rendering it contingent and precarious. The tender of the amount stops interest on the whole claim, if the appellant never recovers any more. A party who refuses a tender loses both interest and costs if he afterwards seeks to enforce his claim by action, simply because the law discourages unnecessary litigation. After an action is begun, an appeal to correct judicial errors is a right, only regulated, but neither favored nor disfavored by the law. A right of tender, therefore, intended merely to prevent interest and costs, should not be abused in order to compel the opposite party either to abandon his appeal, or waive all claim to interest. Both parties deal together, subject to the result of the appeal, as to the question of amount, on which the running of interest as well as future costs must depend, whatever may be the decision on such appeal.

The plaintiffs are also obliged to enter up a judgment in order to bring an appeal. That judgment becomes a debt of record, having the like incidents as other debts, including its bearing interest. It does not merge the original claim, unless the litigation ceases there by the appeal being unsuccessful. A tender and refusal is as effectual as a payment and receipt of moneys to stop interest. There is no principle by which a party is to be absolutely barred from litigating his claim for a larger sum than that paid, merely because he accepts part in order to prevent a loss of interest if he turns out to be wrong. A tender accompanied with a demand of the acceptance of the sum in full discharge of all claims, or any other condition, is bad (Wood a. Hitchcock, 20 *Wend.*, 47), and therefore he, to whom it is made, cannot be compelled to accept it. The actual acceptance of the sum, therefore, only extinguishes a claim where it is all to which the claimant is entitled. What the plaintiffs are entitled to in this case depends on the result of their appeal. I do not know

that if the tender had been refused the defendants would have been bound to make it good by forthwith bringing it into court; or if they did so, I apprehend the court would not make a waiver of the appeal a condition of taking it out, whatever other conditions they might impose.

The motion to dismiss the appeal should, for the reason before given, be denied with costs.

In order to determine the merits of the case before us, it will not be necessary to notice those covenants in the lease in question, for whose breach no damages were proved or claimed, or the parts of the pleadings which relate thereto, except so far as the admission of evidence, or the effect of such covenants, if any, on that covenant for the breach of which damages were recovered, or their influence on the question of those damages may require it. Such lease contained no covenant for general repairs on the premises by either lessors or lessees. The defendants covenanted to do only such repairs as might be rendered necessary by their use and occupation of the premises, besides agreeing to surrender the premises in as good state as reasonable use and wear would permit, damages by the elements excepted. Permission was, however, reserved therein to the plaintiff, their servant, or agent, at all times, during the term, to enter into and inspect the demised premises, and "make such repairs therein as they shall deem proper." The premises were described in such lease as a "five-story marble-front store," and were thereby demised "for the purpose of the drygoods business." The defendants covenanted not to use or occupy them, or to permit them to be occupied, or underlet them for any other business, and not to assign such lease, or the term granted thereby, without the consent of the plaintiffs. The covenant, for whose breach damages were deducted from the claim of the plaintiffs, was not an undertaking by them to do, or forbear to do any thing, but simply a guaranty against the occurrence of a particular event not under their control, to wit, the percolation of water through the walls or floor of the sub-cellar of such building.

What difference it might have made in the practical result of the action, or the admissibility of evidence, or rule of damages, if the defendants had sought to recoup for injury sustained by them by ingress of water into the building in question,

instead of setting off their damages, it is not necessary to discuss. Damages for a breach of a continuing covenant of guaranty against a particular occurrence affecting lands (Mayor, &c., of New York a. Mabie, 13 N. Y. (3 Kern.), 151), or even of a covenant to do a particular act, such as repairing (Nichols a. Dusenbury, 2 N. Y. (2 Comst.), 283), may be recouped. But in the latter case, the defendant is limited to the expense of doing such act, and cannot recover special damages (Dorwin a. Potter, 5 Den., 306), which are not the subject of recoupment (Allaire Iron Works a. Guion, 10 Barb., 55). How far injuries, arising from the ingress of water into a building, although continuing for more than three months, could be sub-divided so as to have the damages arising therefrom during each quarter deducted from the rent therefor, by way of recoupment, is at least doubtful ; claims arising out of one contract cannot be applied in reduction of those growing out of another distinct one, although contained in the same instrument or forming part of one transaction. (Seymour a. Davis, 2 Sandf., 239 ; Deming a. Kemp, 4 Ib., 147.) Whether a covenant to pay rents in quarterly payments does not or does make the payments of each year's or quarter's rent a separate contract, so as to enable the lessee to deduct damages for injuries during each quarter or year, arising from a breach of a continuing covenant, is perhaps immaterial in this case. The claim by the defendants for injuries arising from the entrance of water into the sub-cellar in question is made in the answer by way of set-off, and a prayer is also contained therein for judgment for the excess of their damages beyond rent claimed by the plaintiffs. The claim of the plaintiffs is substantially admitted, and the rights of the defendants to damages for breach of such covenant, as well as the pleadings and evidence in relation thereto, are to be governed by the same rules as if they were plaintiffs in an action on such covenant, and I shall proceed to consider their rights in the same manner as if they stood in that position.

The language of the covenant on which damages were recovered by the defendants is somewhat peculiar. It is not that water should not percolate through the walls and floor of the sub-cellar in that question, but such sub-cellar should be "free from (such) percolation of water." It seems, therefore, not to have intended that as many causes of action should arise as acts

Benkard *a.* Babcock.

of percolation should occur, but rather one only, for the sub-jection of the premises to such ingress of water during the time. The answer also adopts this view by negating the freedom of such sub-cellar from such invasion, and averring that, " during all or the greater part" of the time until then, water had perco-lated through its walls and floor, and rendered the same wet and damp and unfit for use. It also alleges, as an injury from "such wetness, dampness, and presence of water in such cellar," de-privation of its use for the purposes for which it was let to the defendants, and also for the storing of drygoods therein; and avers the difference in value of such premises fit as covenanted in such lease for the business for which they were let, and their value, in consequence of the condition of such cellar, to be a certain sum per annum, which the defendants claim up to a certain date and onward to the time of trial, and damages. This certainly is not a claim for damages for each single act of percolation, during each quarter, and its consequences, to be set off against the rent due at the end of that quarter, but is a claim for general damages for injury to the defendants during all the time previous to the trial, caused by one continuous occurrence consisting of successive acts violative of such covenant. (Shaffer *a.* Lee, 8 *Barb.*, 412.)

No requests to charge were made, or exceptions taken to the charge as made, except as to the effect of certain letters. How the jury arrived at the amount of damages allowed the defendants, does not legally appear on the record. The amount would seem by calculation to correspond with the amount claimed in the answer of annual damages, by reason of the occurrences complained of, if allowed during the time water came into the cellar, from June, 1861, the date of its first ap-pearance there, to its final exclusion by appliances introduced by the plaintiffs. But another claim for damages from a simi-lar cause, during a prior period, was submitted to them by the learned judge before whom the cause was tried, to wit, from the time of the defendants' entering into possession until the November following, but without any evidence in the case, that I have been able to find, to sustain such a claim. There was evidence to prove that such sub-cellar had been damp during the period last mentioned, and that such dampness might have arisen from moisture in the materials of which it had been re-cently built; there was none to prove it arose from any perco-

lation of water in the cellar. The learned judge properly instructed the jury that the defendants could not claim for "any injury resulting from dampness not caused by percolation of water into the sub-cellar; any necessary natural dampness incident to the location of the sub-cellar, or its construction, and not effected at all by water getting through the walls or floor of the sub-cellar, is a consequence which the defendants themselves must bear."

The testimony of one of the defendants (Babcock) was, that he first observed water in the cellar in 1860, without stating where it was, or how it got there, without fixing the date, except prior to August, 1860 : He also stated the cellar generally to be damp at some indefinite time, yet admitted it to be fit for storage for the period between December, 1860, and June, 1861, although not at other times, by "reason of the dampness, liability of the water to percolate through the floor," as to which he furnished no evidence of *indicia.*

Another defendant (Milner) testified to having noticed, without fixing the date, a general dampness throughout the whole store, as well as to the unfitness of the store for the storage of drygoods from May, 1860, to December, 1862. A porter of the defendants (Fitzpatrick) testified that he thought he noticed water around the elevator in June, 1860 ; that the state of the cellar from May to December, 1860, was "damp a little, part of the floor was damp and part dry." He also expressed an opinion as to the fitness of the cellar for storing drygoods from May, 1860, to December, 1862. Another porter (Armstrong) thought "the cellar very damp and wet;" this was some time before the early part of 1861. The father-in-law of one of the defendants (Franklin), who occupied part of the basement, testified, "there was dampness round the columns in August, 1860, and the autumn of that year, and since that time the basement had been so damp he could not stay over an hour there." Also, that after June, 1860, "there was more or less dampness in the sub-cellar all the time." On the other hand, the defendant Milner admitted on his examination that they "deemed the cellar safe for the storage of drygoods from the autumn of 1860 to the spring of 1861 ;" that he thought it very likely that a statement was made to one of the plaintiffs that the place was dry, and there was no water; because at the time they stored

goods there, they considered the basement or sub-cellar reasonably dry:" He also stated that the basement would be "naturally a little damper" than the sub-cellar, and that moisture from the atmosphere would not injure woollen or domestic cotton goods. The agent of the builders of the cellar (Vaughan) constantly examined the cellar, and asked about it of one of the defendants between August, 1860, and April, 1861; but he neither saw nor heard any thing of its dampness: He, among others, testified as to the natural dampness of a cellar, and that it would take six months to dry it. None of the witnesses preserve the distinction very accurately between the dampness of the air of the basement and the cellar, and the moisture of the floor, walls or other solid substances. Stoves and steam apparatus seem to have been employed from time to time to correct the former, and perhaps the latter. The principal if not only subject of complaint from May to December, 1860, was dampness of the atmosphere in the basement and cellar, without the slightest evidence showing that it originated in the oozing of water through the floor or walls. And I am not prepared to consider it as a matter of judicial cognizance that dampness in a room must arise from the percolation of water through its walls or floor, particularly as all the direct evidence in the case shows that it was the inevitable attendant of a newly built cellar. The question of due proof of injury arising from the evil covenanted against, during the period between May and December, 1860, of course is immaterial in reference to its having been submitted as a question of fact to the jury, because there are no exceptions to the charge; but it is important in reference to questions which were excepted to, put to witnesses as to their opinions in regard to deterioration of value in the premises arising from that cause during all that time from May to December, 1862. Thus the defendant Babcock was allowed to state the condition of the sub-cellar in respect to the storage of dry goods during all that time. Another defendant (Milner) was allowed to state what in his judgment the premises in question were worth less per annum during that time "in consequence of the state of that cellar," such state being, as he observed it, merely "general dampness through the whole store, and great dampness in the basement." This certainly was not necessarily injury arising from the entrance of water. Both

those questions were clearly improper, until a proper foundation had been laid by showing that the covenant in question had been violated during all that time.

Another set of questions of a similar character was put to other witnesses in reference to their opinion of the effect upon the yearly value of such store of a certain degree of dampness in the sub-cellar and basement, producing mould upon books, papers, and articles of furniture therein, as well as injury to drygoods. As a necessary foundation for such questions, it should have been preliminarily shown when such dampness existed, as well as that it was caused by the percolation of water through the floor or walls of the sub-cellar; because even if such water entered first through the basement, that formed no cause of action under the covenant in question. Setting aside the evidence, already alluded to, of dampness in the basement and cellar prior to December, 1860, there was no evidence of any ingress of water through the floors of the sub-cellar until about the time of the notice thereof given for the first time by the defendants to the plaintiffs in June, 1861. Mr. Franklin, the occupant of the basement, testified that "after June, 1860, there was more or less dampness in the sub-cellar all the time. . . . . The basement had been very damp, always damp, so much so that I could not stay there any time since August, 1860. I observed a green mould upon my desk, chair, cushion, and books; some of my papers were entirely damp, so that they were almost illegible." He also testified that his papers, in tin boxes placed in a wooden box within an iron safe, "have been saturated, and are still:" He saw the green mould in the autumn of 1860, say in September; he could not state the day. One of the porters (Armstrong) stated that, in his opinion, the cellar never was fit for drygoods, because after opening cases to take out samples, and leaving them open, in two days they would see a "kind of fur" covering the papers, being the mould before spoken of by him. He also testified, without specifying any time, that "Mr. Franklin's desk and books were in such a a state . . . . because it was so damp we could not brush it off. There was a kind of mould at different times upon the chairs, and that pasteboard covers of goods were wet through." One of the defendants (Babcock) stated in his testimony, "There are in the basement, books, a desk, chairs, and other things,

Benkard *a.* Babcock.

which are mildewed, covered with green mould," without stat-
ing when or from what cause it came there. Another (Milner)
says, " He had seen mould on Franklin's desk," and had seen
goods damp, but with the same indefiniteness as to time. A
Mr. Tuttle, another witness, saw the mould on the desk on some
occasion when he was there during six or eight visits to the
sub-cellar; but without giving their dates, except they were
during 1861 and 1862, and prior to December, 1862; and he
observed water in the cellar every time. Assuming that such
mould and dampening of the covers of goods were seen by the
witnesses after June, 1861, when the water percolated through
the floor, there was no evidence offered to show that it must
have originated from moisture produced by the evaporation
from such water, and not from that incident to a cellar damp
from other causes. It was in evidence that other causes did
produce such moisture, and that it produced the mould and
dampened the goods, for even Mr. Franklin saw that in Sep-
tember, 1860, before any water entered, and it was left to con-
jecture to determine that it arose afterwards from the water
which had oozed in. It is true, the coincidence in time of the
presence of the water, the damp air, and the mould, might
possibly have been thereby established, but neither the court
nor the jury would have a right to conjecture therefrom that
they were inevitably connected with each other. Several wit-
nesses (Lloyd, Paterson, and Tuttle), however, were allowed to
state their opinion of the effect upon the value of the store,
basement, and sub-cellar, which merely such moisture in the
latter as to cause dampness in the basement, and mould on cases
of goods and on Franklin's furniture, books, and papers, and car-
toons of goods, would have without regard to or any proof of the
origin of such moisture. Such testimony being immaterial by
itself, could only have an effect to produce an undue bias on the
minds of the jury. The exceptions thereto were, therefore, im-
properly overruled. Still more objectionable questions were put
to two other witnesses (Townsend and Tuttle), who had only made
a few visits to the premises, whose varying condition they ob-
served and described, and were asked to state how much less,
in their opinion, for the drygoods business, such store, basement,
and sub-cellar were worth yearly, in consequence of such con-
dition. That assumed, without evidence, that such condition

continued at least for a year. Tuttle especially was asked about the effect of dampness in the basement, although he had never noticed it, and only saw mould as its effect; while the water found by Townsend was more or less, "sometimes but little, or other times an inch or an inch and a half in depth:" So that the former was made to testify as to the effect of a cause of which he knew nothing, and the latter to the permanent effects of fluctuating causes. Those questions should have been excluded when objected to.

Two witnesses (Milner and Tuttle) were allowed to testify as experts, after objection, as to the effect of the state of the cellar upon the value of the premises in question, when their only stock and extent of experience consisted of having hired stores and being acquainted with their value. They do not appear to have been acquainted with the effect on a yearly rent of dampness in a basement or water in a sub-cellar. A mere knowledge of the value of stores which never had a damp basement, would not assist any one in determining the extent of its deteriorating effects on such value. A singular question was also allowed to be put to a medical practitioner, whether a certain state of dampness in a cellar, producing certain effects, would not be injurious to the health of an occupant of the store to which such cellar belonged. There was no evidence in the case that the health of any of the defendants had been injured by the violation of the covenant complained of, or that they had lost the services of any clerk thereby, or an opportunity of renting the store, or that the danger to an occupant's health was one of the influences which would cause a depreciation in the value of a store in consequence of having a wet cellar. Possibly the court may have allowed the question, first, as matter of discre-, tion, on the supposition that such facts would be proved, and their attention was not called to it, so as to warn the jury against being influenced by it: Still, it was a dangerous exercise of that discretion, as it had a natural tendency to influence their minds, and, being matter of opinion only, should have had the facts which justified its admission first proved. It was, at all events, faulty in assuming the dampness to have been proved to have originated, not in the sweating of a new cellar or other causes, but in the percolation of water.

Another objection, to which every question put to the wit-

nesses on the trial in relation to the difference of yearly value of the premises by reason of the dampness, is exposed, is, that they either assume without proof that such dampness affected such yearly value in the market, or do not discriminate between such reduction and yearly damages, caused by the dampness, to be set off against the rent: in other words, they do not distinguish between such yearly diminution as an element or item of damage and as a standard of damages, throwing out of view all evidence of positive physical injury either to goods or otherwise; or they take it as another element of damage to be added to that last referred to. No preparation was made for receiving it legally as a measure of damages, by ascertaining preliminarily whether dampness usually diminished the value of a store by fixed rates, and that the witnesses knew it: it was clearly not a separate element of damages, unless, besides the probable injury to goods and loss of business embraced in it, the defendants were to be compensated for actual injury. The answers of the witnesses show how they understood such questions; they evidently speculated on the probable amount of injury to the business and the goods, and fastened the loss on the rent, without undertaking to say that such considerations would or did influence persons about to hire stores for the drygoods business.

As a general rule, opinions of witnesses as to damages sustained by one person from the conduct of another, or occurrences for which he is responsible, are inadmissible (Fish a. Dodge, 4 *Den.*, 311; Morehouse a. Matthews, 2 *N. Y.* (2 *Comst.*), 514; Duff a. Lyon, 1 *E. D. Smith*, 536; Dunham a. Simmonds, 3 *Hill*, 609), although stated with the facts on which they are founded (Cook a. Brockway, 21 *Barb.*, 331; Lincoln a. Saratoga & Schenectady R. R. Co., 23 *Wend.*, 425; Haryer a. Edmonds, 4 *Barb.*, 256), even when such facts are proved, by other witnesses, to have attended the occurrence complained of. (Paige a. Hazard, 5 *Hill*, 603.) Opinions of the value of articles may be given by those familiar with the identical article, or similar ones. (Clark a. Baird, 9 *N. Y.*, 183.) But wherever the value of the subject to be estimated is uncertain and varying, the witness can only give the elements of value as facts, and leave the jury to make their own estimates. (Dunlap a. Snyder, 17 *Barb.*, 561; Maxwell a. Palmerston, 21 *Wend.*, 407.) Probable damage to the business or merchandise of a

merchant, by the effects of vapor from a cellar during any fixed time, could not well be measured by any proportion of the rent. It is not probable that any one would hire a store at a rent whose low amount would compensate him for damages to his goods or injury to his business. The only way in which such defect would probably operate on landlords and tenants, would be, by the store commanding tenants such as would not require the use of the parts affected by dampness, or whose business did not suffer from it, and who could not afford to pay the higher rent of a sound store. At all events, no evidence in this case discloses in what way such probable damage affects such yearly value. No question was put to a single witness as to whether the dampness of a cellar affected the yearly value of a store measurably to any extent capable of being stated in money value. Dampness clearly did not affect the rent directly, nor through the medium of actual injury to business or goods; and if it did so in any other way, it must be shown to have done it in that way. The witnesses showed the consequences of putting the question in the mode adopted of assuming that dampness did affect yearly value, and simply calling upon them to state the amount; and the basis of an estimate may be seen in the testimony of one witness (Townsend). He took as the basis of his estimate of the depreciation of rent the loss of a place for samples, the annoyance of procuring another, and injury to goods; which presupposes the occupation of the store, and actual injury, irrespective of diminution in the market value. As those injuries would depend on fluctuating causes, the jury were the sole proper judges of their extent, when the facts were given.

There was also another serious objection, in giving evidence of a deterioration in the market value of the stores by the dampness of the cellar—which was, that the defendants could not assign their interest in the premises without the consent of the plaintiffs, and it was not therefore a vendible commodity; their sole value to the defendants was their right of occupying them. The law might transfer them to another, the parties could not.

The questions put to witnesses, therefore, as to deterioration in value of the premises, or some of them, were inadmissible on some one or more of the grounds already stated, to wit:

Benkard a. Babcock.

1st. The evidence did not establish that the dampness referred to arose from the evil covenanted against.

2d. It did not establish that the witnesses whose opinion was sought were experts in the effect of dampness in cellars upon the rents of stores.

3d. If the questions put were intended to elicit the opinions of witnesses as to the value of the probable extent of injury to the goods and business of the defendants, it was substituting the witnesses in place of the jurors, who alone are judges of the facts.

4th. If such questions were intended to elicit the opinion of witnesses as to a loss in the market value of the store, they were premature, until it was shown that dampness in cellars depreciated such value; and even if it had been shown, the defendants could not lose what, by the terms of the lease, they had no right to gain.

For which reasons, as the exceptions to such questions were well taken, it renders any consideration of other topics almost unnecessary. The defendants, for their own sake, would have been obliged to do something to prevent the effects of the water: they could not legally have allowed it either to remain or re-enter, so as to produce all the harm it could, in order to recover all the damages they could therefor from the plaintiffs. The contract is one of indemnity merely,—in fact closely resembling that of insurance, particularly as it is against one of the elements: the plaintiffs are, therefore, entitled to compensation for actual loss alone for the expense of repairing past and preventing future evils, besides deprivation of temporary use of the building, or permanent deterioration of it. The acts done by the plaintiffs may not have been strictly repairs; their entry, however, was under the defendants' license, until May, 1862. No physical obstruction was ever placed in the way of their proceedings, and they completed the work of excluding the water from the cellar. The notices given in July and May of that year, of course did not disentitle the defendants to compensation for damages which were the natural and necessary result of the percolation of water, and either not caused by their own delay in preventing repairs, or caused by the improper delay of the plaintiffs, who undertook to make them; but they had no other effect. What might have been the

rights of the parties, if the plaintiffs had retired pursuant to such notices, it is not necessary to decide.

The judgment therefore should be reversed, and a new trial granted, with costs to abide the event.